# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DELAWAREANS FOR EDUCATIONAL OPPORTUNITY and NAACP DELAWARE STATE CONFERENCE OF BRANCHES, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2018-0029-VCL |
| JOHN CARNEY, Governor of the State of Delaware; SUSAN BUNTING, Secretary of Education of the State of Delaware; KENNETH A. SIMPLER, Treasurer of the State of Delaware; SUSAN DURHAM, Director of Finance of Kent County, Delaware; BRIAN MAXWELL, Chief Financial Officer of New Castle County, Delaware; and GINA JENNINGS, Finance Director for Sussex County, Delaware, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION

Date Submitted: August 29, 2018
Date Decided: November 27, 2018

Ryan Tack-Hooper, Karen Lantz, ACLU FOUNDATION OF DELAWARE, INC., Wilmington, Delaware; Richard H. Morse, Brian S. Eng, COMMUNITY LEGAL AID SOCIETY, INC., Wilmington, Delaware; *Counsel for Plaintiffs.*

Barry M. Willoughby, Lauren E.M. Russell, Elisabeth S. Bradley, Lauren Dunkle Fortunato, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; *Counsel for Defendants John Carney, Susan Bunting, and Kenneth A. Simpler.*

William W. Pepper Sr., Gary E. Junge, SCHMITTINGER & RODRIGUEZ, P.A., Dover, Delaware; *Counsel for Defendant Susan Durham.*

Herbert W. Mondros, Helene Episcopo, MARGOLIS EDELSTEIN, Wilmington, Delaware; *Counsel for Defendant Gina Jennings.*

Adam Singer, Mary A. Jacobson, NEW CASTLE COUNTY OFFICE OF LAW, New Castle, Delaware; *Counsel for Defendant David M. Gregor.*

Norman M. Monhait, ROSENTHAL, MONHAIT & GODDESS, P.A., Wilmington, Delaware; *Counsel for Amicus Curiae The Education Law Center.*

**LASTER, V.C.**

The Education Clause in Delaware's constitution states: "[T]he General Assembly shall provide for the establishment and maintenance of a general and efficient system of free public schools . . . ."[1] This clause manifests Delaware's commitment to provide a free public education to all of Delaware's children. It is a constitutional obligation that rests squarely on the State.

In their complaint, the plaintiffs allege that Delaware is failing—profoundly and pervasively—to meet its constitutional commitment to children from low-income families, children with disabilities, and children whose first language is not English (collectively, "Disadvantaged Students"). The numbers of affected students are considerable. Delaware has over 50,000 low-income students, more than 20,000 students with disabilities, and almost 10,000 students whose first language is not English.

In support of their claim that Delaware is failing to educate Disadvantaged Students, the plaintiffs cite the Delaware Department of Education's own standards and assessments. To evaluate student proficiency in grades three through eight, the Delaware Department of Education uses an assessment tool developed by the Smarter Balanced Assessment Consortium (the "Smarter Balanced Assessment"). To evaluate student proficiency in grades eleven and twelve, the Delaware Department of Education uses scores from the Scholastic Aptitude Test ("SAT"). The Delaware Department of Education uses the resulting scores to determine whether students are meeting Delaware's standards for grade-

---

[1] Del. Const. art. X, § 1.

level proficiency. Only students whose scores meet Delaware's proficiency standards are considered to be on track for college and career readiness.

For the 2015–16 school year, Disadvantaged Students in grades three through eight achieved the following results on the Smarter Balanced Assessment:[2]

- Low-Income Students:
  - Language Arts: 35.60% met State standards; 64.40% did not.
  - Math: 25.42% met State standards; 74.58% did not.

- Students With Disabilities:
  - Language Arts: 13.48% met State standards; 86.52% did not.
  - Math: 10.36% met State standards; 89.64% did not.

- English Language Learners:
  - Language Arts: 15.14% met State standards; 84.86% did not.
  - Math: 18.10% met State standards; 81.90% did not.

The highpoint among these figures is the language arts performance of low-income students, where one in three met the standard for grade-level proficiency. Two in three did not. In other areas, the results were worse. Three out of four low-income students were not proficient in math. Nine out of ten students with disabilities were not proficient in either

---

[2] *See* Del. Dept. of Educ., State Template for the Consolidated State Plan Under the Every Student Succeeds Act (2017) [hereinafter ESSA Plan], https://ww2.ed.gov/admins/lead/account/stateplan17/decsa2017.pdf. By citing this document extensively, the complaint incorporated it by reference. The complaint uses rounding conventions inconsistently when presenting figures from the ESSA Plan. This decision presents the figures as they appear in the ESSA Plan.

language arts or math. Eight out of ten students learning English as a second language were not proficient in either language arts or math.

For the 2016–17 school year, Disadvantaged Students in third and eighth grade achieved the following results on the Delaware Department of Education's assessments:

- Low-Income Students:
    - Third Grade Language Arts: 37% proficient; 63% not proficient.
    - Third Grade Math: 39% proficient; 61% not proficient.
    - Eighth Grade Language Arts: 34% proficient; 66% not proficient.
    - Eighth Grade Math: 25% proficient; 75% not proficient.
- Students With Disabilities:
    - Third Grade Language Arts: 21% proficient; 79% not proficient.
    - Third Grade Math: 24% proficient; 76% not proficient.
    - Eighth Grade Language Arts: 11% proficient; 89% not proficient.
    - Eighth Grade Math: 7% proficient; 93% not proficient.
- English Language Learners:
    - Third Grade Language Arts: 32% proficient; 68% not proficient.
    - Third Grade Math: 40% proficient; 60% not proficient.
    - Eighth Grade Language Arts: 5% proficient; 95% not proficient.
    - Eighth Grade Math: 5% proficient; 95% not proficient.

Just one in ten eighth graders with a disability was proficient in language arts. Less than one in ten was proficient in math. Just one in twenty eighth graders learning English as a second language was proficient in language arts, with the same holding true for math.

3

For the 2016–17 school year, students in the eleventh and twelfth grades achieved the following results:

- Low-Income Students:

    o Reading: 34% met State standards; 66% did not.

    o Essay Writing: 32% met State standards; 68% did not.

    o Math: 12% met State standards; 88% did not.

- Students With Disabilities:

    o Reading: 7% met State standards; 93% did not.

    o Essay Writing: 10% met State standards; 90% did not.

    o Math: 5% met State standards; 95% did not.

- English Language Learners

    o Reading: 6% met State standards; 94% did not.

    o Essay Writing: 7% met State standards; 93% did not.

    o Math: 5% met State standards; 95% did not.

For low-income students, just one in ten demonstrated grade-level proficiency in math. For students with disabilities, less than one in ten demonstrated grade-level proficiency in reading, just one in ten demonstrated grade-level proficiency in essay writing, and one in twenty demonstrated grade-level proficiency in math. For English language learners, less than one in ten demonstrated grade-level proficiency in any area. Just one in twenty demonstrated grade-level proficiency in math.

To reiterate, the complaint does not cite assessments that measured Delaware's Disadvantaged Students against an external set of standards that someone else imposed.

The complaint cites the criteria for grade-level proficiency that the Delaware Department of Education chose for itself.

In addition to citing these educational outputs, the complaint cites educational inputs. Key indicators of educational quality include levels of spending, teacher effectiveness, class size, and the availability of support services.

The complaint alleges that Delaware fails to provide adequate funding for Disadvantaged Students. One reasonable and common sense inference supported by the allegations of the complaint is that Disadvantaged Students need *more* funding and *more* services than their more privileged peers. In Delaware, however, the educational funding system generally provides more support for more privileged children than it provides for impoverished children.[3] Put differently, schools with more Disadvantaged Students receive *less* financial support from the State than schools with fewer Disadvantaged Students. Likewise, school districts with poorer tax bases receive *less* funding from the State than school districts with wealthier tax bases. Unlike thirty-five other states, Delaware provides no additional financial support for educating low-income students. Unlike forty-six other states, Delaware provides virtually no additional financial support for educating students who are learning English as a second language.

---

[3] Because different schools and school districts have different numbers of students, it is misleading to compare aggregate funding per school. To establish a basis for comparison, the complaint describes funding on a per-student basis. This appears to be a widely used metric in the case law and academic literature. All of the financial comparisons in this decision are drawn from the complaint and expressed on a per-student basis.

The complaint further alleges that Delaware's schools fail to provide Disadvantaged Students with the classroom environments and educational services that they need to succeed. The complaint alleges that schools can address the needs of Disadvantaged Students through smaller class sizes, appropriate specialists, dual-language teachers, adequate counseling, and other efforts designed to reach and engage with student families. The complaint alleges that in Delaware, schools with more Disadvantaged Students have larger classes, fewer specialists, fewer counselors, and insufficient dual-language teachers. The complaint also alleges that many Disadvantaged Students attend schools that have become re-segregated by race and class.

At the pleading stage, these allegations support a reasonable inference that Delaware is failing to fulfill its constitutional obligation to educate Disadvantaged Students. This reasonable inference draws additional support from the complaint's allegations regarding the findings made by a series of committees, established during the past two decades under the auspices of the General Assembly or by the Governor, which have investigated Delaware's public schools, made similar observations, and reached similar conclusions.

Notably, the plaintiffs do not blame the principals, teachers, and other professionals who work with Disadvantaged Students. The plaintiffs instead challenge a system that has charged educators with helping Disadvantaged Students achieve grade-level proficiency, yet has failed to provide the financial and educational resources that would enable them to perform that task. The plaintiffs assert that the "system of public schools" is failing Disadvantaged Students, not the hardworking and well-intentioned professionals who do their best within the constraints that the system imposes.

6

As relief, the plaintiffs ask the court to issue the following declaratory judgments:

- All school-age children residing in Delaware have a fundamental right to a free public school education.

- The Education Clause requires that the State provide funding for public schools in a manner that creates a meaningful opportunity for all students to obtain an adequate education.

- Delaware's existing system of financing its public schools violates the Education Clause because it fails to provide the resources that are necessary to educate Disadvantaged Students.

- Delaware's existing system of public schools fails to provide an education for Disadvantaged Students that complies with the Education Clause.

In addition to these declarations, the plaintiffs seek equitable relief compelling the State to comply with its constitutional obligations. This relief would take the form of particularized injunctions, either mandatory or prohibitive, that would be framed based on the facts proven at trial.

As defendants, the plaintiffs have named the three State officials primarily responsible for overseeing, administering, and enforcing the education laws, including the system for funding Delaware's public schools. Those officials are the Governor, the Secretary of Education, and the State Treasurer. The plaintiffs have sued these individuals only in their official capacities. No one accuses them of creating the problem. Everyone agrees that they are sincerely concerned about the quality of public education in this State.

The State officials have moved to dismiss the complaint. In a striking concession, they do not argue the complaint's allegations fail to plead that Delaware's public schools are failing to educate Disadvantaged Students. They agree that "not all of Delaware's

7

public schools are serving Delaware students the way they need to."[4] Instead, they take the bold position that the Education Clause requires that the State provide students with a meaningful education. They say that the Education Clause only requires that the system be "general," in the sense of generally encompassing all of Delaware's students, and "efficient," in the sense of using centralization to reduce administrative costs and yield economic efficiencies.

Under this interpretation, as long as the State established a state-wide program and labeled it "a system of public schools," then the State would satisfy the Education Clause. At the extreme, the State could corral Disadvantaged Students into warehouses, hand out one book for every fifty students, assign some adults to maintain discipline, and tell the students to take turns reading to themselves. Because the State does not think the Education Clause says anything about the quality of education, even this dystopian hypothetical would satisfy their version of the constitutional standard. Indeed, under a strict interpretation of the State's argument, this nightmare scenario would be constitutionally preferable to the current system, because it would be equally general (it would cover all students) and much more efficient (it would generate additional cost savings).

In my view, the plain language of the Education Clause mandates that the State establish a system of free public schools, and it uses the term "schools" in accordance with its ordinary and commonly understood meaning—as a place where students obtain an

---

[4] Dkt. 20 at 1 ("DOB").

education. The adjectives "general and efficient" relate to and function in service of this noun. Consequently, when the Delaware Constitution mandates that the State create and maintain "a general and efficient system of free public schools," it contemplates a system that educates students and produces educated citizens. The system of public schools must actually provide schooling.

This reading finds support in the legislative history of the Education Clause. During the decades leading up to the Constitutional Convention of 1897, leaders in Delaware expressed concern about the quality of its public schools. They criticized Delaware's patchwork quilt of numerous small school districts, and they bemoaned the lack of uniformity that resulted in educational standards that varied widely across the State. These concerns led the delegates to call for a "a general and efficient system of free public schools," but they did not admire these attributes for their own sake. The delegates sought better educational outcomes, and they wanted a general and efficient system that produced educated citizens. The legislative history also shows that the delegates expected the Education Clause to be enforced in court.

Delaware was not the only state that revised its constitution during the latter half of the nineteenth century. Sixteen other states adopted similar education clauses in this era. The highest courts in thirteen of those states have considered whether their comparable education clauses have a qualitative dimension. All said they do.

The Education Clause therefore has substantive content and mandates that Delaware establish and maintain a school system that educates the students it serves. The State accepts that if this is the case, then the plaintiffs have pled a constitutional violation. In any

9

event, the complaint's allegations support a reasonable inference that the State is violating the Education Clause by failing to provide a general and efficient system of public schools that educates Disadvantaged Students. The complaint's allegations support a reasonable inference that the State has determined what a meaningful education should look like. The complaint's allegations also support a reasonable inference that the State has demanded that public schools educate Disadvantaged Students to that standard. But according to the complaint, a critical component is missing: The State has not provided schools with the financial and educational inputs that they need to fulfill that charge. As a result, Disadvantaged Students achieve educational outcomes that fall short of grade-level proficiency.

More broadly, the complaint's allegations support a pleading-stage inference that in critical respects, Delaware's system of public schools favors more privileged students at the expense of Disadvantaged Students. Seventy years ago, citizens could perhaps debate what might constitute sufficiently comparable schools under the fundamentally unsound and fully discredited notion of "separate but equal," yet this court ably determined that Delaware's schools for African-American children were not equal to Delaware's schools for white children.[5] The complaint's allegations regarding how the State allocates financial and educational resources, coupled with its allegations regarding how Disadvantaged

---

[5] *Belton v. Gebhart*, 87 A.2d 862, 868 (Del. Ch. 1952) (Seitz, C.), *aff'd sub nom. Gebhart v. Belton*, 91 A.2d 137 (Del. 1952), *aff'd sub nom. Brown v. Bd. of Educ. of Topeka*, 349 U.S. 294 (1954).

10

Students have become re-segregated by race and class, support an inference that the current system has deep structural flaws. These flaws are so profound as to support a claim that the State is failing to maintain "a general and efficient system of free public schools" that serves Disadvantaged Students. That is particularly true where it appears at the pleading stage that the three categories of Disadvantaged Students constitute "discrete and insular minorities," whose status "tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry."[6]

The State's other principal ground for dismissal maintains that even if the Education Clause requires that Disadvantaged Students receive a meaningful education, and even if Delaware's public schools fall short of the mark, the constitutional obligation is not one the judiciary can enforce. The shortcomings of the public schools, the State says, present a non-justiciable political question that the courts cannot address.

To support this argument, the State contends that because the Education Clause commands that "the General Assembly establish and maintain a general and efficient system of free public schools," the judiciary has no role. In my view, the Education Clause directs the General Assembly to carry out a task. It does not say that the General Assembly gets to judge for itself whether it has fulfilled that task. Under our system of checks and balances, the judiciary performs the latter function through the mechanism of judicial

---

[6] *United States v. Caroline Products Co.*, 304 U.S. 144, 152 n.4 (1938).

11

review. "[O]nly the Delaware judiciary has the power, 'province and duty . . . to say what the law is' . . . ."[7]

As further support for their political-question argument, the State maintains that it is impossible for a court to determine what constitutes a meaningful education. Fortunately, the plaintiffs are not asking this court to determine in the abstract what a meaningful education should look like. They make a more basic and straightforward claim: When educating Disadvantaged Students, Delaware's public schools must meet the standards and criteria that the Delaware Department of Education has chosen for itself. When judged by this standard, the public school system enjoys an advantage that few of its students ever receive: the ability to decide what will be on the test. A court can readily apply these established standards to the facts of the case. A court can also determine whether the current system discriminates against Disadvantaged Students rather than assisting them.

Consistent with the vast majority of courts that have addressed similar questions, I believe this case is justiciable. The judiciary must of course afford full respect to the General Assembly's power to declare public policy in this State and to determine what is in the public interest. The judiciary must also recognize that the General Assembly has greater institutional competence in many areas and represents the preferred forum for addressing difficult social issues. And the judiciary must be sensitive to the complexity

---

[7] *Evans v. State*, 872 A.2d 539, 549 (Del. 2005) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803)); *accord State ex. rel. Oberly v. Troise*, 526 A.2d 898, 905 (Del. 1987).

inherent in creating and maintaining a system of public schools, including the many dimensions and interests involved. Nevertheless, the responsibility for determining whether a particular statutory regime complies with or violates the Education Clause, either facially or as applied, lies with the judicial branch.

Because the plaintiffs have stated justiciable claims, the motion to dismiss is denied.

## I.     FACTUAL BACKGROUND

By choosing to move to dismiss the plaintiffs' complaint, the defendants have triggered the application of a plaintiff-friendly standard. At this phase of a case, the facts are drawn from the plaintiffs' pleading. All well-pled allegations are assumed to be true, and the plaintiffs receive the benefit of all reasonable inferences.

Because this opinion applies the standard that governs when a defendant has moved to dismiss a complaint, the factual recitations in this opinion do not constitute findings of fact. It may turn out, after trial, that the complaint included allegations that the plaintiffs believe and which have some evidentiary support, but which the plaintiffs cannot prove by a preponderance of the evidence. For present purposes, however, the plaintiffs well-pled allegations must be accepted as true.[8]

---

[8] In this case, the allegations of the complaint are specific and detailed. Many of them parallel observation about the state of Delaware's public schools made by Chief Justice Leo E. Strine, Jr. in 2017 when he delivered the James R. Soles Lecture on the Constitution and Citizenship at the University of Delaware. *See* Leo E. Strine, Jr. *Delaware's Constitutional Mirror Test: Our Moral Obligation to Make the Promise of Equality Real*, 17 Del. L. Rev. 97 (2018) [hereinafter Strine, *Mirror Test*]. The Chief Justice delivered his address on September 22, 2017. The Chief Justice reprised these themes in an editorial that ran a week later in the Wilmington News Journal. *See* Leo E.

13

## A. Delaware's System of Public School

Delaware's system of public schools serves approximately 138,000 students.[9] The state has nineteen school districts with 225 traditional public schools.[10] Delaware also has six vocational schools, twenty-four public charter schools, and three magnet schools.[11]

Title 14 of the Delaware Code establishes the legal structure for Delaware's system of public schools. Through this statute, the General Assembly vested "[t]he general administration of the educational interests of the State . . . in a Department of Education of the Executive Branch."[12] By statute, the Department of Education "shall exercise general control and supervision over the public schools of the State."[13] The Department of Education is required by statute to "adopt rules and regulations, consistent with the law of the State, for the maintenance, administration and supervision throughout the State of a general and efficient system of free public schools."[14] The Department of Education is also

---

Strine, Jr., *How to Fight Resegregation and Inequality in Our Schools*, Del. Online (Sept. 28, 2017), https://www.delawareonline.com/story/opinion/contributors/2017/09/28/how-fight-resegregation-and-inequality-our-schools-dialogue-delaware/710350001/.

[9] Data is for the 2016-17 school year. *See* http://www.rodelfoundationde.org/ataglance/ (last visited November 19, 2018).

[10] *Id.*

[11] *Id.*

[12] 14 *Del. C.* § 101.

[13] 14 *Del. C.* § 121.

[14] 14 *Del. C.* § 122(a).

required by statute to establish "rules and regulations . . . governing the statewide assessment of student achievement and the assessment of the educational attainments of the Delaware public school system."[15]

The Department of Education has carried out its charge by codifying uniform academic standards for every major learning subject area at every grade level.[16] The Department of Education also regulates the availability of school resources, personnel, and other aspects of instruction.[17]

To assess the educational performance of Delaware's public schools, the Department of Education has adopted a standardized-testing regime known as the Delaware System of Student Assessment. The system is "designed to measure student achievement of state content standards," including grade-level standards and college readiness.[18] It encompasses (i) testing in language arts and mathematics using the Smarter Balanced Assessment in grades three through eight, (ii) testing uses the Delaware

---

[15] 14 *Del. C.* § 151(a).

[16] *See* 14 Del. Admin. C. § 501, § 501.1 (listing areas of study subject to "content standards"); *id.* § 502 ("Alignment of Local School District Curricula to State Content Standards"); *id.* § 503 (requiring local school districts to provide instruction in English Language Arts, Mathematics, Science, Social Studies, Physical Education, Visual and Performing Arts, Career and Technical Education, and World Language to grades K-12).

[17] *See, e.g.*, *id.* §§ 106-108 (teacher, specialist, and administrator appraisal); *id.* § 616 (school discipline); *id.* § 815 (health examinations and screening); *id.* § 901 (education of homeless children and youth).

[18] *Id.* § 101.

Comprehensive Assessments System in grades five, eight, and ten; and (iii) testing using the SAT in the eleventh and twelfth grades.[19] The State has established four levels of student performance: (i) proficient, (ii) superior, (iii) outstanding, and (iv) inadequate to demonstrate proficiency.[20]

The assessment criteria describe what students must know and be able to do at a particular grade level. Academic promotion decisions are based on the student's assessment results.[21] To graduate, high school students must meet the State's testing requirements and complete the State's required coursework.[22]

As part of the State-wide regime, the Department of Education issues an annual report, called an "Educational Profile," for each Delaware public school (including charter schools and vocational schools) and for the State as a whole.[23] The purpose of the Educational Profile is "[t]o monitor progress and trends towards the achievement of the State's educational goals, to provide parents and citizens with information they can use to

---

[19] See Delaware Department of Education, Delaware System of Student Assessments (DeSSA) Executive State Summary, 2016-2017 Administration 6 (July 2017), https://www.doe.k12.de.us/cms/lib/DE01922744/Centricity/Domain/535/DeSSA%20Executive%20State%20Summary%202017.pdf.

[20] *See* 14 Del. C. § 153.

[21] *See* 14 *Del. C.* § 151(d).

[22] *See* 14 *Del. C.* § 152.

[23] *See* 14 *Del. C.* § 124A(a).

make good choices for their children and to hold the public educational system accountable for the performance and cost-effective use of public funds."[24]

Delaware's public schools receive funding from federal, state, and local sources. For Fiscal Year 2016, 60% came from State sources, 31% came from local sources, and 9% came from federal sources.[25]

State funding falls into three buckets. Division I funding pays for administrators, teachers, and other personnel.[26] The State pays for these positions according to a salary schedule that provides more funding for more senior personnel.[27] Division II funding primarily pays for energy costs and materials and supplies, but can be used for any school purpose except transportation.[28] Division III funding is known as budget equalization funding and is allocated based on a formula designed to provide additional funds to less wealthy school districts.[29]

The funds allocated to Division I dwarf the amounts allocated to Divisions II and III. In Fiscal Year 2018, Division I funds constituted 89% of the total for all three buckets.

---

[24] 14 *Del. C.* § 124A(b).

[25] Compl. ¶ 27.

[26] *See id.* ¶ 28; 14 *Del. C.* §§ 1702(a), (c).

[27] *See* Compl. ¶ 34; 14 *Del. C.* § 1705.

[28] *See* Compl. ¶ 28; 14 *Del. C.* §§ 1702(a) & (d), 1706.

[29] *See* Compl. ¶ 28; 14 *Del. C.* § 1707.

By contrast, 2.6% of State expenditures went to Division II and 8% to Division III. The State provides separate sources of funding for transportation and other specific programs.[30]

Each year, the Delaware Department of Education allocates funding to school districts and individual schools based on their "units of pupils" on the last day of September. The number of students that comprise one unit varies with the type and grade of the students. For grades four through twelve, twenty "Regular Education" students make up a unit, as do 8.4 "Basic Special Education" students. For kindergarten through third grade, 16.2 students make up a unit, regardless of whether the students are Regular Education students or Basic Special Education students.[31]

The number of units determines the number of staff that each school can hire. By law, at least 98% of the Division I funding associated with a school's units must be used at that school. The school district only has flexibility to reallocate the remaining 2%. A school district can determine how it will deploy the unit funding to hire personnel within each school, but the number of units is fixed. If a school district allocates a school's unit funding for particular staff positions, such as reading specialists or behavioral counselors, it has less unit funding available for teachers.[32]

From 1978 until 1995, the four school districts in northern New Castle County

---

[30] *See* Compl. ¶¶ 29–30.

[31] *See* Compl. ¶¶ 31–32; 14 *Del. C.* §§ 1703–04.

[32] *See* Compl. ¶ 33; 14 *Del. C.* § 1704.

operated under federal court oversight to achieve desegregation.[33] Shortly after the lifting of the desegregation order, the General Assembly enacted the Neighborhood Schools Act of 2000 to regulate the assignment of students to schools in these districts.[34] It requires that the covered school districts assign "every student within the district to the grade-appropriate school closest to the student's residence, without regard to any consideration other than geographic distance and the natural boundaries of neighborhoods," subject to an exception only "if a substantial hardship to a school or school district, student or a student's family exists."[35] The statute further provides that "no student shall be assigned to any school on the basis of race and school assignments shall be made without regard to the racial composition of the schools."[36]

## B.  Delaware's Disadvantaged Students

The complaint seeks relief on behalf of three categories of Disadvantaged Students: children from low-income families, children with disabilities, and children whose first language is not English. The complaint asserts that for these students, Delaware has failed to provide a public school system that delivers on the State's promise of educational opportunity.

---

[33] *See Coalition to Save Our Children v. State Bd. of Educ.*, 90 F.3d 752, 757-58 (3d Cir. 1996) (summarizing history of federal oversight).

[34] *See* 27 Del. Laws. ch. 287 (2000).

[35] 14 *Del. C.* § 223.

[36] *Id.*

19

### 1. Low-Income Students

Approximately one-third of the students attending Delaware's public schools meet the Delaware Department of Education's definition of "low income."[37] For the 2016–17 school year, Delaware identified 51,319 students as children from low-income families, representing more than 37% of the overall student population.[38]

---

[37] Compl. ¶ 84. Delaware places a student within this category if the student's family receives benefits under either the Temporary Assistance for Needy Families program ("TANF") or the Supplemental Nutrition Assistance Program ("SNAP").

TANF is a federally funded block-grant program that Congress implemented in 1996, replacing the federal Aid to Families with Dependent Children program that had provided financial assistance to low-income families since 1935. Individual states administer the block grants, determine benefits, and set criteria for receipt. In Delaware, qualifying for benefits under TANF depends on a combination of factors, including household income. To provide a general sense of the cutoffs for TANF in Delaware, a family of two (such as a single parent with one child) can only receive benefits if its gross household income does not exceed $1,904 per month, or $22,848 per year; a family of four can only receive benefits if its gross household income does not exceed $2,903 per month, or $34,836 per year. *See generally Temporary Assistance for Needy Families (TANF)*, Delaware.gov, www.dhss.delaware.gove/dss/tanf.html (last visited Nov. 15, 2018).

SNAP is federally funded program, jointly administered with the states, that provides nutritional assistance to low-income individuals and families. It uses an Electronic Benefit Transfer card, replacing and modernizing the program historically known as "food stamps." *See generally A Short History of SNAP*, U.S. Dept. of Agric.: Food & Nutrition Service (Sept. 17, 2018), https://www.fns.usda.gov/snap/short-history-snap. To provide a general sense of the cutoffs for SNAP in Delaware, a family of two can only receive benefits if its gross household income does not exceed $1,784 per month, or $21,408 per year; a family of four can only receive benefits if its gross household income does not exceed $2,720 per month, or $32,640 per year. *See generally Food Supplement Program*, Delaware.gov, https://www.dhss.delaware.gov/dss/foodstamps.html (last visited Nov. 15, 2018).

[38] Compl. ¶ 85.

### a.      The Challenges Facing Low-Income Students

Compared to their wealthier peers, low-income students face many disadvantages. They typically start school behind other students in reading, writing, and mathematics.[39] They are also more likely than other students to face challenges due to environmental factors associated with their low-income status, such as:

- Lack of access to a healthy diet;

- Recurring medical issues;

- Lack of stable housing, and

- Violence at home and in their neighborhoods.

Precisely because their families have low household incomes, these students face higher levels of financial stress. Broader challenges include pervasive stereotypes about children who live in poverty.[40]

Any of these issues would be individually challenging. For low-income students, these issues often appear in combination. Without support, low-income students face a greater risk of developing emotional and behavioral problems, including deficits in their ability to self-regulate, to focus and pay attention, and to deal with frustration. These consequences interfere with their ability to learn.[41]

---

[39] *Id.* ¶ 86(a).

[40] *Id.* ¶ 86(b). *See generally* Ruby K. Payne, A FRAMEWORK FOR UNDERSTANDING POVERTY (4th ed. 2005) (discussing the different typical experiences of members of different socioeconomic classes).

[41] Compl. ¶¶ 86(c)–(e).

Low-income students can overcome these challenges if they receive greater support from their schools. The complaint identifies measures that have been shown to help compensate for the challenges associated with low-income status, including:

- smaller class sizes;

- access to more skilled and experienced teachers;

- supplemental supports in counseling, including access to school psychologists, and social workers;

- additional reading and math instruction;

- wider availability of after-school programs;

- expanded school-to-work partnership programs; and

- mental health services and wellness centers.

In short, low-income students benefit from targeted and concerted efforts to reach and engage both the children and their families in effective learning while at the same time connecting them with available services and supports.[42]

### b. The Challenges Of High-Need Schools

In Delaware, low-income students often cluster in particular schools and school districts ("High-Need Schools").[43] On average, students in schools where more than 40% of the population consists of low-income students perform worse academically, read less,

---

[42] *See id.* ¶¶ 87–95.

[43] *See, e.g.*, Nat'l Ctr. for Educ. Statistics, Concentration of Public School Students Eligible for Free or Reduced School Lunch (2018), https://nces.ed.gov/programs/coe/pdf/coe_clb.pdf.

have lower attendance rates, and are more likely to have serious developmental delays and untreated health problems.[44] The complaint alleges that 93 of Delaware's public schools have student populations where more than 40% of the students qualify as low-income. In some of these schools, more than 80% of the students qualify.[45]

Because they have more low-income students, and because low-income students need more educational services, High-Need Schools require more resources than other schools.[46] High-Need Schools also experience higher rates of teacher turnover. In Delaware, the rate of annual teacher turnover across all schools statewide is 15%. Yet the annual turnover rate at Bayard Middle School, a High-Need School, is approximately 30%, and in the 2015–16 school year, it was more than 60%.[47]

Because they have more low-income students, and because low-income students face a range of challenges, High-Need Schools require additional resources to provide services for these students.[48] Providing professional treatment services within schools can help low-income students address behavioral issues and mitigate discipline problems. Without designated professionals, teachers must take time away from teaching to address

---

[44] Compl. ¶¶ 120, 153, 157, 159–60.

[45] *Id.* ¶ 118.

[46] *Id.* ¶¶ 127, 137–42; *see* Strine, *Mirror Test*, at 109.

[47] Compl. ¶ 124.

[48] *See* Strine, *Mirror Test*, at 118 ("[K]ids who have less, need more.").

disciplinary problems.[49] Likewise, providing wellness centers within schools can help address health issues. In Delaware, High-Need Schools frequently lack sufficient professionals, and elementary schools and middle schools rarely have wellness centers.[50]

### c.     The Intersection Between Poverty And Race

Regrettably, Delaware's public school system has become racially re-segregated, and many High-Need Schools have vastly higher percentages of students of color than wealthier schools.[51] As a result, the challenges of poverty intersect with dimensions of race.[52]

The complaint identifies salient examples of the re-segregation of Delaware's schools and its effect on High-Need Schools. Several examples involve the Red Clay Consolidated School District, which during the 2016–17 school year had a student population that was 43.6% white, 6.6% Asian, 20.5% African-American, and 26.5% Hispanic/Latino. Yet at Warner Elementary School, a High-Need School, the student population was 2.6% white, 0.7% Asian, 75.5% African-American, and 16.8% Hispanic/Latino. Over 93% of the students at this High-Need School were students of color. At Shortlidge Elementary School, another High-Need School, the student population was 3.3% white, less than 0.5% Asian, 76.7% African-American, and 15.9%

---

[49] *See* Compl. ¶ 93.

[50] *See id.* ¶¶ 94–95.

[51] *See id.* ¶ 71; Strine, *Mirror Test*, at 105–06.

[52] *See* Strine, *Mirror Test*, at 115.

Hispanic/Latino. Once again, over 93% of the student population comprised students of color. These figures contrasted sharply with the student population of Heritage Elementary School, a low-poverty school, which was 70% white, 2.6% Asian, 9.7% African-American, and 14.8% Hispanic/Latino. The Charter School of Wilmington, an exceptionally low-poverty school, was 57.5% white, 30.9% Asian, 6.3% African-American, and 4% Hispanic/Latino.[53]

The complaint alleges that Disadvantaged Children in the City of Wilmington face additional challenges because they are split into four public school districts. In each district, they comprise a small minority of the students. To successfully organize and mobilize for change across the City, families must convince four separate school boards. Because their numbers are divided among four districts, families have difficulty gaining representation on the school boards and having their voices heard.[54]

The complaint attributes the re-segregation of Delaware's public schools to the State's decision to abandon the enrollment and transportation policies that had previously resulted in highly integrated public schools, the adoption of the Neighborhood School's Act, and the authorization of a charter schools program that permits the use of admission

---

[53] *See* Compl. ¶ 70; *Red Clay District*, Delaware.gov (Summer 2018), http://profiles.doe.k12.de.us/SchoolProfiles/District/Student.aspx?checkSchool=0&district Code=32&district=Red+Clay.

[54] *See* Compl. ¶¶ 72–77; Strine, *Mirror Test*, at 118.

criteria with a disparate impact on low-income students.[55] The complaint alleges that these policies deprive Disadvantaged Students of an adequate education.

### d. Delaware's Counterintuitive Approach To Providing Resources For Low-Income Students

Given the incremental needs of low-income students relative to their wealthier peers, schools that predominantly serve low-income students logically should receive more resources than schools that do not. Because low-income students face additional educational challenges, it follows that low-income students should receive instruction from more experienced and effective teachers. At a minimum, low-income students should not receive instruction from less effective teachers than wealthier students.

In Delaware, neither proposition is true. Unlike thirty-five other states, Delaware does not provide any additional funding for low-income students. The unit funding approach that Delaware uses does not take low-income status into account.

Delaware also does not take steps to encourage experienced and effective teachers to work at High-Need Schools. Instead, the opposite is true: Low-income students are five times *more likely* than non-low-income students to be taught by a teacher that has been rated "ineffective."[56]

---

[55] *See* Compl. ¶¶ 67–77; 14 *Del. C.* §§ 220, 501–18.

[56] Compl. ¶ 92; *see* Strine, *Mirror Test*, at 110.

26

Under the State salary scale, experienced teachers make more money than less experienced teachers. Largely as a result of the allocation of teachers, Delaware spends more money on students in wealthier schools than on students in High-Need Schools.[57] For many of Delaware's public schools, an inverse relationship exists between the number of low-income students in a school and the amount of funding that goes to the school: The more low-income students in a school, the less State funding the school receives.[58]

A similarly counterintuitive relationship exists between the amount of resources that a school district receives from the State and the value of its tax base. The amount of local funding that a school district can raise depends in part on the value of the property in its tax base. A school district with a more valuable tax basis can more easily raise any given sum than a less wealthy peer district because the amount raised represents a smaller percentage of the wealthier district's tax base.

To counter the effects of poverty, one might expect that Delaware would provide more funding to school districts with less valuable tax bases. To its credit, Delaware offers Division III funding to offset the financial advantage possessed by wealthier districts. But the effects of Division III funding are swamped by the far larger effect of the Division I

---

[57] Compl. ¶¶ 34, 37; *see* Strine, *Mirror Test*, at 110.

[58] Compl. ¶ 35. To support this claim, the plaintiffs analyzed school-by-school data from the Appoquinimink, Capital, Caesar Rodney, Christina, Indian River, Milford, and Red Clay Consolidated School Districts. *Id.*

funds that pay personnel costs. The Division III program also does not incorporate any factor that accounts for the greater needs of Disadvantaged Students.[59]

As a result, under the existing system, Delaware provides more funding to districts with wealthier tax bases than it does to poorer districts. In 2013–14, for example, the tax basis in the Brandywine School District was 1.5 times more valuable per student than the tax base in the Woodbridge School District. Yet the State provided funding to the Brandywine School District that was equivalent to $1,694 more per pupil than the funding it provided to the Woodbridge School District.[60] During the same year, the value of the tax base in the Appoquinimink School District exceeded the value of the tax base in the Caesar Rodney School District by more than $100,000 per student, yet the State allocated funding to the Appoquinimink School District that was equivalent to $450 more per pupil than it provided to the Caesar Rodney School District.[61]

Delaware's system of unit funding also penalizes High-Need Schools in other ways.[62] To serve the needs of low-income students, High-Need Schools need more personnel, including professionals with diverse qualifications. With limited exceptions, the "unit funding" approach treats all students as if they were the same. If a High-Need School

---

[59] *See id*. ¶¶ 46–47.

[60] *Id*. ¶ 36.

[61] *Id.*

[62] *See generally* 14 *Del. C.* §§ 1703, 1704, 1706

28

wishes to hire reading specialists or counselors, it has less unit funding to pay for teachers and other personnel. To make the numbers work, High-Need Schools must find the money by cutting elsewhere.

One option is to cut extracurricular activities, like clubs and sports, or eliminate special programs, such as gifted and talented education.[63] Schools also may forego a full-time librarian or cut an art or music teacher.[64] These steps deprive low-income students of opportunities to build confidence, achieve success outside of the traditional classroom, and develop skills that could lead them out of poverty. The absence of extracurricular activities and special programs also impairs the ability of children attending High-Need Schools to obtain admission to selective schools like Conrad School of Science or Cab Calloway School of the Arts. Unlike children applying from wealthier schools, children from High-Need Schools cannot point to their participation and achievements in special programming.[65]

Another option is to reduce the number of teachers in traditional subjects and allow class sizes to increase. In the High-Need Schools in the Christina School District and the Capital School District, many classes have more than thirty students. As of October 31, 2017, two of the three fifth-grade classes at Smith Elementary School had thirty-six

---

[63] *See* Compl. ¶¶ 127, 146–47.

[64] *See id*. ¶ 127.

[65] *See id*. ¶ 147.

students, and the third had thirty-two students. At Oberle Elementary School, each fifth grade class had thirty-three to thirty-five students, and each fourth-grade class had thirty-one to thirty-two students. At Kirk Middle School, the honors social studies class had forty students.[66]

Particularly for low-income students, smaller class sizes—not larger ones—are linked to student success. Students in large classes suffer from reduced access to certified teachers. State law mandates that unless the Delaware Department of Education grants a waiver, there cannot be more than twenty-two students in a class in kindergarten through third grade.[67] To respond to the law and address the problems of large class sizes, High-Need Schools in the Christina School District have hired additional paraprofessionals in place of certified teachers.[68] Although the paraprofessionals doubtless aid in student learning and classroom function, the low-income students in these classes are not receiving the same degree of access to certified teachers that their wealthier and more privileged peers receive.

Other practical problems resulting from large class sizes include the basic question of obtaining books. Science and math curriculum materials are sold in units of thirty. Unless a school purchases an extra set, there are not enough for every student in a class

---

[66] *See id.* ¶ 128.

[67] 14 *Del. C.* §1705A(a).

[68] *See* Compl. ¶ 133.

larger than thirty to have a book. Students have gone without books in Smith Elementary School, Skyline Middle School, Kirk Middle School, and Bayard Middle School.[69] Similar problems arise with inadequate access to other classroom resources, such as computers.[70]

If school districts had greater flexibility in deploying funds, they could shift money within districts to support their High-Need Schools. State law effectively forecloses that option by requiring that 98% of the funding generated by a school's units be used at the school accounting for the units.[71]

Another option is simply to refrain from hiring the needed specialists. At Seaford High School, a High-Need School, there is no reading specialist. According to the most recent state test results, more than 65% of the students at Seaford High School fail to meet the state proficiency standards for language arts.[72] The Caesar Rodney School District has elected not to hire additional counseling staff, resulting in the existing counselors being overwhelmed by demand. A similar situation exists in the Red Clay Consolidated School District at A.I. DuPont High School, where a child in need may have to wait a week for an appointment to see a counselor. Waiting times in the Christina School District also

---

[69] *See id.* ¶¶ 129–33.

[70] *See id.* ¶¶ 134, 142.

[71] *See id.* ¶ 42; 14 *Del. C.* §§ 1704, 1706.

[72] Compl. ¶ 135.

approach a week.[73] Smith Elementary School chose to forego hiring a computer teacher.[74] Linden Hill Elementary School cut its librarian, requiring a technology teacher to double part-time in that role. In the Christina School District, the high schools and middle schools do not have full-time librarians.[75]

### e. The Problematic Results Of Delaware's Approach To Low-Income Students

Based on the Delaware Department of Education's own metrics, the complaint alleges that Delaware's public schools are failing to educate low-income students. In 2017, the Delaware Department of Education reported on the number of low-income students in grades three through eight who met state standards for proficiency in language arts and math based on the Smarter Balanced Assessment. Based on data from the 2015–16 school year, only 35.60% of low-income students met state standards in language arts; 64.40% did not. Only 25.42% of low-income students met state standards in math; 74.58% did not.[76]

For the 2016–17 school year, based on the Smarter Balanced Assessment, the Delaware Department of Education reported the following results for low-income students in third and eighth grade:

---

[73] *See id.* ¶¶ 137–38

[74] *Id.* ¶ 139.

[75] *Id.* ¶ 140.

[76] *See* ESSA Plan, *supra* at 3.

32

- Third Grade Language Arts: 37% proficient; 63% not proficient.

- Third Grade Math: 39% proficient; 61% not proficient.

- Eighth Grade Language Arts: 34% proficient; 66% not proficient.

- Eighth Grade Math: 25% proficient; 75% not proficient.[77]

For the same year, based on performance on the SAT, the Delaware Department of Education reported the following results for low-income students in eleventh and twelfth grade:

- Reading: 34% met State standards; 66% did not.

- Essay Writing: 32% met State standards; 68% did not.

- Math: 12% met State standards; 88% did not.[78]

These results support a reasonable inference that Delaware is not providing a system of public schools that is fulfilling its educational purpose for low-income students.

### 2. Students With Disabilities

Approximately 15% of the students attending Delaware's public schools have at least one diagnosed disability. For the 2016–17 school year, this percentage translated into approximately 20,000 children.[79]

---

[77] Compl. ¶¶ 80–81.

[78] *Id.* ¶ 82.

[79] *Id.* ¶ 97.

Students with disabilities can qualify for additional services under two federal statutes. The first is Section 504 of the Rehabilitation Act of 1973,[80] which is designed to protect the rights of individuals with disabilities to participate in programs and activities that receive federal financial assistance. The implementing regulations require that a school district provide a "free appropriate public education" to each qualified student with a disability within the school district's jurisdiction, regardless of the nature or severity of the disability. To receive services under Section 504, a student must have a formally diagnosed physical or mental impairment that substantially limits one or more major life activities.[81] Generally speaking, the purpose of providing services under Section 504 is to enable children with disabilities to learn alongside their peers and have access to the same educational opportunities that their classmates receive. School districts seek to achieve this goal by providing accommodations, such as seating at the front of the class, extended time on tests, access to textbooks in alternative formats (like audiobooks), and the ability to take short breaks. Students also may receive services such as speech-language therapy, occupational therapy, or help with study skills. In some cases, the 504 Plan may contemplate modifications in the educational program, such as shorter readings or fewer

---

[80] 29 U.S.C. § 794 ("No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .").

[81] *See* 34 C.F.R. § 104.3(j)(2).

vocabulary words. Once a child has been identified as eligible for supports or services under Section 504, the school district must prepare a "504 Plan," which documents the accommodations or modifications that the child will receive.[82]

The second statute is the Individuals with Disabilities Education Act ("IDEA"), which mandates that children with statutorily identified types of disabilities receive special education and related services that will enable them to receive "a free appropriate public education."[83] In general, the IDEA defines a "child with a disability" as a child

> (i) with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this chapter as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and (ii) who, by reason thereof, needs special education and related services.[84]

Within thirty days after determining that a child is eligible, the school district must prepare an Individualized Education Plan ("IEP") for the child. In contrast to a 504 Plan, which seeks to enable the child with a disability to learn in the same environment as peers, an IEP contemplates individualized special education and related services to meet the unique needs of the child.[85]

---

[82] *See generally Disability Discrimination: Frequently Asked Questions*, U.S. Dept. of Educ., https://www2.ed.gov/about/offices/list/ocr/frontpage/faq/disability.html (last visited Nov. 15, 2018).

[83] *See* 20 U.S.C. §§ 1400(d)(1)(A), 1401(9).

[84] 20 U.S.C. § 1401(3)(A).

[85] *See generally* IDEA: Individuals with Disabilities Education Act, U.S. Dept. of Educ., https://sites.ed.gov/idea/?src-policy-page (last visited Nov. 15, 2018).

### a. Delaware's Counterintuitive Approach To Providing Services To Students With Disabilities

Precisely because they have at least one disability, these students need more resources and support to succeed than students without disabilities. Schools who serve larger numbers of students with disabilities logically should reserve more resources than schools that do not.

Yet as with low-income students, Delaware takes a counter-intuitive approach to providing resources to students with disabilities. *Delaware does not allocate any additional resources* to schools that serve students with disabilities in kindergarten through third grade. The only exception is if a student has an IEP that identifies their required educational program as "intensive" or "complex."[86] During the critical formative years, Delaware does not allocate any additional resources for schools serving students with 504 Plans or who have IEPs calling for individualized programs that are neither "intensive" nor "complex."

Delaware's counterintuitive approach extends to staffing. Because children with disabilities require more services, including specialized staff, it would be logical for schools serving children with disabilities to receive additional staff, including appropriate specialists. Delaware, however, has not provided schools with enough specialists to support students with disabilities, and the problem is particularly acute for children in kindergarten

---

[86] Compl. ¶ 100.

through third grade.[87] For example, children attending Bayard Middle School and Marshall Elementary School in the Christina School District have faced delays in obtaining IEPs— and some never receive them—because the district lacks sufficient specialists to conduct the evaluations.[88] The specialists that the Christina School District does have carry overwhelming caseloads of more than 100 students. As a result, children who have IEPs often go without services because their specialists are too overworked.[89]

Starved of the necessary resources, Delaware's schools have developed stopgap measures. Some schools hired general education teachers who also have the certification required to teach special education students. Although an improvement over no special education at all, these professionals must perform double duty filling both roles.[90] A more pernicious stopgap measure is the apparent refusal of Delaware's public schools to identify children who need IEPs. The percentage of students identified as needing IEPs has been rising across the country, while falling in Delaware.[91] There is no reason to believe that children in Delaware are different. Rather, Delaware's policies create powerful incentives for schools to resist identifying students who need services.

---

[87] *Id.* ¶ 103.

[88] *Id.* ¶ 104.

[89] *Id.* ¶ 105.

[90] *Id.* ¶ 106.

[91] *Id.* ¶ 101.

### b. The Problematic Results Of Delaware's Approach To Students With Disabilities

Based on the Delaware Department of Education's own metrics, the complaint alleges that Delaware's public schools are failing to educate students with disabilities. For the 2015–16 school year, using the Smarter Balanced Assessment, the Delaware Department of Education identified the number of students with disabilities in grades three through eight who met its own standards for proficiency in language arts and math. In language arts, 13.48% of students with disabilities met State standards; 86.52% did not. In math, 10.36% of students with disabilities met State standards; 89.64% did not.[92]

For 2016–17, based on the Smarter Balanced Assessment, the Delaware Department of Education reported on the number of students with disabilities in third and eighth grade who met Delaware's standards:

- Third Grade Language Arts: 21% proficient; 79% not proficient.

- Third Grade Math: 24% proficient; 76% not proficient.

- Eighth Grade Language Arts: 11% proficient; 89% not proficient.

- Eighth Grade Math: 7% proficient; 93% not proficient.[93]

For the same year, based on their performance on the SAT, the Delaware Department of Education reported on the number of students with disabilities in the eleventh and twelfth grades who met Delaware's standards:

---

[92] ESSA Plan, *supra*, at 3.

[93] Compl. ¶¶ 80–81.

- Reading: 7% met State standards; 93% did not.

- Essay Writing: 10% met State standards; 90% did not.

- Math: 5% met State standards; 95% did not.[94]

These results support a reasonable inference that Delaware is not providing a system of public schools that is fulfilling its educational purpose where students with disabilities are concerned.

### 3. English Language Learners

Approximately 7% of the students attending Delaware's public schools are learning English as a second language. For the 2016–17 school year, this percentage translated into approximately 9,980 children.[95] Approximately two-thirds of Delaware's English language learners are in High-Need Schools.[96]

The predominant language for teaching students in Delaware is English. Precisely because these students are learning English, they need more resources and support to succeed. Schools who serve larger numbers of students who are learning English as a second language logically should reserve more resources than schools that do not.

Delaware does not provide any additional funding for educating students who are learning English as a second language. Delaware is one of only four states that does not

---

[94] *Id.* ¶ 82.

[95] *Id.* ¶ 107.

[96] *Id.*

allocate any additional funding to serve the unique needs of these students.[97]

Many school districts do not have sufficient teachers who are trained to teach English as a second language ("ESL").[98] The accepted educational standard is that a student learning English as a second language should see an ESL teacher five days per week. At New Castle Elementary School in the Colonial School District, students see an ESL teacher only twice a week.[99]

Based on the Delaware Department of Education's own metrics, the complaint alleges that Delaware's public schools are failing to educate students who are learning English as a second language. For the 2015–16 school year, using the Smarter Balanced Assessment, the Delaware Department of Education identified the number of ESL students in grades three through eight who met its own standard for proficiency. In language arts, only 15.14% met State standards; 84.86% did not. In math, only 18.10% met State standards; 81.90% did not.[100]

For the 2016–17 school year, the Delaware Department of Education reported on the number of ESL students in third and eighth grade who met the State's standards for proficiency based on the Smarter Balanced Assessment:

---

[97] *See 2017–18 Delaware Public Education at a Glance*, Rodel Found. of Del., http://www.rodelfoundationde.org/ataglance (last visited Nov. 19, 2018).

[98] Compl. ¶ 110; *see id.* ¶¶ 112, 114.

[99] *Id.* ¶ 111.

[100] ESSA Plan, *supra*, at 3.

- Third Grade Language Arts: 32% proficient; 68% not proficient.

- Third Grade Math: 40% proficient; 60% not proficient.

- Eighth Grade Language Arts: 5% proficient; 95% not proficient.

- Eighth Grade Math: 5% proficient; 95% not proficient.[101]

For the same year, the Delaware Department of Education reported on the number of students learning English as a second language in eleventh and twelfth grade who met the State's standards for proficiency based on their performance on the SAT:

- Reading: 6% met State standards; 94% did not.

- Essay Writing: 7% met State standards; 93% did not.

- Math: 5% met State standards; 95% did not.[102]

These results support a reasonable inference that Delaware is not providing a system of public schools that is fulfilling its educational purpose for ESL students.

C.      **The State's Knowledge Of The Problems And Potential Solutions**

The complaint pleads that Delaware's officials have long known about the problems facing Disadvantaged Students and the potential solutions for addressing them. In April 2000, when the General Assembly adopted the Neighborhood Schools Act, it established a Wilmington Neighborhood Schools Committee to report on the challenges facing High-Need Schools and propose solutions. Although focused on schools in Wilmington, the

---

[101] Compl. ¶¶ 80–81.

[102] *Id.* ¶ 82.

41

committee's observations and recommendations applied equally to High-Need Schools elsewhere in Delaware.[103] The committee's report detailed how the State's educational funding formula was failing to serve the needs of low-income students. It also explained that High-Need Schools required additional funding from the State to be able to recruit and develop the professionals necessary to provide students with an adequate education.[104]

In 2008, the General Assembly established the Wilmington Education Task Force and charged it with examining the state of public education in the City of Wilmington.[105] The report made a variety of recommendations for improving public education in the City of Wilmington. Among other things, the report observed that State funding formulas must be modified to reflect the diverse needs of students and to ensure that schools have adequate and equitable funding.[106] The report also discussed the need to recruit additional teachers for High-Need Schools and provide them with supplemental training.[107] Although focused on schools in Wilmington, the committee's observations and recommendations again

---

[103] *See* Compl. ¶ 155.

[104] *See id.* ¶¶ 154–55. *See generally Harden v. Christina School District*, 924 A.2d 247, 255–56 (Del. Ch. 2007) (Strine, V.C.).

[105] Compl. ¶ 157; *see Wilmington Educ. Task Force, Final Report* (2008), http://www.rodelfoundationde.org/wp-content/uploads/2016/10/Wilmington-Public-Schools-Task-Force-2008.pdf.

[106] *See* Wilmington Educ. Task Force, *supra*, at 7.

[107] *See id.* at 9.

applied to High-Need Schools across Delaware.[108]

In 2014, Governor Jack Markell established the Wilmington Education Advisory Committee to provide input on educational issues. In April 2015, the committee issued a report that criticized Delaware's system for funding public schools and recommended changes.[109]

In 2015, the Delaware General Assembly adopted a joint resolution that recognized the problems inherent in Delaware's system for funding public schools, as well as the problems faced by Disadvantaged Students.[110] In the resolution, the General Assembly made the following determinations:

- "[T]he current education funding system was developed 3/4 of a century ago and does not reflect the needs of today's children, teachers, schools, and districts . . . ."[111]

- "Delaware is 1 of only 4 states in the nation that does not provide additional funding for English language learners, and 1 of only 15 states that does not provide additional funding for students in poverty . . . ."[112]

---

[108] Compl. ¶ 160.

[109] *See* Wilmington Educ. Advisory Comm., Strengthening Wilmington Education: An Action Agenda (2015), https://cpb-us-w2.wpmucdn.com/sites.udel.edu/dist/7/3504/files/2015/08/weac-final-book-2015-web-uxn0ge.pdf.

[110] *See* S.J. Res. 4, 148th Gen. Assemb. (Del. 2015).

[111] *Id.* at 1.

[112] *Id.*

- "A modernized education funding system . . . would allow the State to target resources to students in poverty, students with disabilities, English language learners, and other high-needs children . . . ."[113]

Having made these findings, the General Assembly established an Education Funding Improvement Commission to conduct a comprehensive review of Delaware's public education funding system and make recommendations to modernize and strengthen the system. The General Assembly instructed the commission to make recommendations regarding (i) "[t]ransitioning to a student-focused funding system and weighting funding based on demographic characteristics of students," and (ii) "[i]ntroducing more flexibility for the state, districts, and schools to raise and spend resources more effectively for their students."[114] The complaint does not describe the resulting report, but publicly available information indicates that the commission conducted a substantial amount of work and made important recommendations.[115]

The various reports exhibit a remarkable consensus about the key steps that the State needs to take to address the problems with Delaware's public schools and improve educational outcomes for Disadvantaged Students. Foremost among the recommendations is to restructure how Delaware funds its public schools.

---

[113] *Id.*

[114] *Id.* at 2.

[115] *See Education Funding Improvement Commission*, Del. Dept. of Educ., https://www.doe.k12.de.us/page/2602 (last visited Nov. 15, 2018).

**D.      This Litigation**

On January 16, 2018, the plaintiffs filed this litigation. Both plaintiffs are institutions with a strong interest in Delaware's educational system and the challenges faced by Disadvantaged Students.

Delawareans for Educational Opportunity is a nonprofit association of Delawareans who are concerned about whether the State is providing all children with an adequate education. They have joined together for the purpose of improving the Delaware education system so that all children have a meaningful opportunity to obtain an adequate education regardless of where they live, their economic circumstances, their health, their disability status, or their first language. The membership of Delawareans for Educational Opportunity includes the parents of Disadvantaged Students who are enrolled in Delaware's public schools.

The NAACP Delaware State Conference of Branches ("NAACP-DE") is a non-partisan organization affiliated with the National Association for the Advancement of Colored People. NAACP-DE has seven branches located throughout the State. NAACP-DE's mission is to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate race-based discrimination. NAACP-DE is dedicated to ensuring that all students in Delaware have an equal opportunity to obtain a high quality public education. Members of the NAACP-DE have worked since 1915 to remove barriers to the participation of minority students on a fully equal basis, and to ensure that all students receive the services they need to succeed. The members of NAACP-DE and its branches include parents of Disadvantaged Students who are enrolled in Delaware's public schools.

45

The plaintiffs' complaint asserted three claims. In Counts I and II, the plaintiffs asserted that the State of Delaware is violating the Education Clause. Count III asserted that the counties are violating the statutory requirement that the assessed value of property reflect the property's "true value in money."[116] In an earlier decision, this court held that Count III stated a claim on which relief could be granted.[117] This decision addresses Counts I and II.

As defendants for Counts I and II, the plaintiffs named John Carney, Susan Bunting, and Kenneth A. Simpler. As defendants for Count III, the plaintiffs named three county officials who are responsible for collecting taxes in their respective counties. Because this decision addresses Counts I and II, it does not discuss the county officials.

Carney is Delaware's current Governor. The Governor is vested with "[t]he supreme executive powers of the State" and is charged with "tak[ing] care that the laws be faithfully executed."[118] Governor Carney has recognized the problems that Disadvantaged Students face. In 2017, he characterized powerfully and accurately the situation described in the complaint, observing that while Delaware's public schools have many dedicated teachers

---

[116] 9 *Del. C.* § 8306(a).

[117] *See Delawareans for Educ. Opportunity v. Carney*, 2018 WL 4849935 (Del. Ch. Oct. 5, 2018).

[118] Del. Const. art. III, §§ 1, 17.

and principals, the levels of student proficiency at many schools fall "well short of what's acceptable."[119] He continued by observing that

> right now, we're consigning far too many of our students to a life that no parent wants for their child. Every student we graduate who can't do basic math or who can't read or write, we're sending into the world knowing he or she doesn't have the tools to succeed. Doors are closing for these children before they even leave the third grade.
>
> I believe, and I know you do too, that it would be immoral to let this situation continue this way.[120]

At its core, the complaint asserts that the situation Governor Carney identified is not only a moral problem, but also a violation of the Education Clause.

Bunting is Delaware's current Secretary of Education. The Secretary of Education is "[t]he administrator and head of the Department [of Education,] appointed by the Governor, with the advice and consent of the Senate, and . . . serve[s] at the pleasure of the Governor."[121] The Department of Education is vested with "[t]he general administration of the educational interests of the State."[122]

---

[119] *Governor Carney to Christina Board: Let's Partner to Improve Wilmington Schools*, Delaware.gov (Oct. 3, 2017), https://news.delaware.gov/2017/10/03/governor-carney-christina-board-lets-partner-improve-wilmington-schools/.

[120] *Id.*

[121] 14 *Del. C.* § 102(a).

[122] 14 *Del. C.* § 101.

Simpler is Delaware's current State Treasurer. The State Treasurer is the "Trustee of the School Fund" and "make[s] disbursements authorized by law."[123] The State Treasurer also "serve[s] as treasurer of each reorganized school district in the State" as well as receiver and custodian of "all moneys to which the reorganized school districts are entitled by law and all those moneys collected for school purposes by the receiver of taxes and county treasurer . . . ."[124]

To reiterate, no one has accused these individuals personally of engaging in any wrongdoing. No one suggests that they created the current situation. The plaintiffs instead challenge the educational system. Because the plaintiffs are focused on the system rather than the individuals, this decision does not refer to the officials by name. It refers to the "State" and speaks in terms of positions that "the State" has taken.

The plaintiffs seek relief in the form of the judicial declarations described in the introduction. They also seek orders and decrees that would require the State to cease violating its constitutional obligations. The framing of specific relief, if warranted, will take place only after a trial, and only if the plaintiffs successfully prove a constitutional violation.

---

[123] 29 *Del. C.* §§ 2704, 2705(b).

[124] 14 *Del. C.* § 1047.

## II.     LEGAL ANALYSIS

In *Brown v. Board of Education of Topeka*,[125] the Supreme Court of the United States recognized the fundamental importance of education, both for individual success and as the foundation for civil society:

> [E]ducation is perhaps the most important function of state and local governments. . . . It is required in the performance of our most basic public responsibilities . . . . It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.[126]

"Providing public schools ranks at the very apex of the function of a State."[127] "Indeed, education is often viewed as a state-given fundamental right."[128]

The Education Clause represents Delaware's promise to provide educational opportunity through "a general and efficient system of free public schools." In Counts I and II of their complaint, the plaintiffs contend that Delaware has failed to fulfill its promise to educate Disadvantaged Students.

---

[125] 347 U.S. 483 (1954).

[126] *Id.* at 493.

[127] *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972).

[128] Edward S. Sacks, *Education Article X*, *in* THE DELAWARE CONSTITUTION OF 1897: THE FIRST ONE HUNDRED YEARS 169, 171 (Randy J. Holland & Harvey Bernard Rubenstein eds., 1997) [hereinafter FIRST ONE HUNDRED YEARS].

The State has moved to dismiss both counts, arguing that the legal theories fail to state a claim on which relief can be granted. When considering such a motion, "(i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim, [and] (iii) the Court must draw all reasonable inferences in favor of the non-moving party."[129] When applying this standard, "dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[130]

The State argues that it can meet this high bar for Count I because the Education Clause does not mandate any minimum level of education. As the State sees it, the Education Clause only requires something that can be called a "system of public schools." It does not matter for constitutional purposes whether the system does any educating. In the State's view, the complaint's allegations about Disadvantaged Students not receiving an education are beside the point and do not matter, because the Education Clause does not require that the State provide Disadvantaged Students with an education.

The State attempts to obtain dismissal of Count II by misconstruing what the plaintiffs seek. The complaint asserts that because the Education Clause mandates that the State create and maintain a system of public schools, the State must provide enough financial resources to each school district to enable the district's schools to meet that

---

[129] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (internal quotation marks and footnotes omitted).

[130] *Id.* (internal quotation marks omitted).

constitutional mandate, including for Disadvantaged Students. The plaintiffs maintain that the State is not providing sufficient resources to educate Disadvantaged Students. Instead, counterintuitively, the State is discriminating against Disadvantaged Students by providing more funding to wealthier districts with fewer Disadvantaged Students and less funding to poorer districts with more Disadvantaged Students. The State has reinterpreted this claim as a demand for an equal amount of funding per student. The State correctly observes that the Education Clause does not require an equal amount of funding per student, but that is not what the plaintiffs are contending.

The State finally claims that even if the complaint adequately pleads that Delaware's system of public schools is failing to meet its constitutional commitment to Disadvantaged Students, the claim is nevertheless non-justiciable. The State argues that the General Assembly must be permitted to decide for itself whether it has fulfilled its constitutional mandate.

For the reasons that follow, this decision rejects these positions. Counts I and II state justiciable claims on which relief can be granted.

A.    **Count I: The Claim That Delaware's System Of Public Schools Fails To Provide A Meaningful Education To Disadvantaged Students**

In Count I, the plaintiffs contend that Delaware's public schools are not providing a meaningful education to Disadvantaged Students. In support of this claim, they cite (i) the dismal educational outcomes that Disadvantaged Students achieve on the assessment tools that the Delaware Department of Education has selected to evaluate grade-level proficiency and (ii) the inadequate levels of educational inputs that Disadvantaged Students

51

receive, particularly when clustered in High-Need Schools. The State contends that Count I cannot state a viable claim because the Education Clause does not have any qualitative component. The State believes that as long as the General Assembly has established a system that is "general," in the sense of applying uniformly state-wide, and "efficient," in the sense of using centralization to generate cost savings, then the constitutional mandate is satisfied. Under this approach, the Education Clause does not require that Delaware's system of public schools actually provide any schooling to Delaware's students. One consequence of this approach is that a plaintiff could never bring a constitutional challenge based on the quality of Delaware's schools. No matter how bad the education might be, there could never be a violation of the Education Clause because (as the State sees it) that provision does not require any minimum level of education.

The plaintiffs view the Education Clause differently. They contend that a "general and efficient system of free public schools" necessarily contemplates that the schools will provide schooling. The plaintiffs believe that if they can prove that the system of free public schools is not educating Disadvantaged Students, then they will have established a constitutional violation.

Following the lead of other jurisdictions, the parties have framed the qualitative question as whether the Education Clause requires "adequate" public schools or an "adequate" public education, and they call this the "adequacy requirement." In my view, this terminology is misleading, because it implies that the plaintiffs are asking the court to determine for itself, in the abstract, what constitutes an adequate education. Judges are neither education experts nor education professionals. For understandable tactical reasons,

the State harps on the incongruity of a judge setting educational policy and determining what an adequate education should look like. They open their submissions by quoting from an intermediate appellate court in Florida that issued one of the comparatively few decisions to embrace the State's position:

> The most effective manner in which to teach students science, mathematics, history, language, culture, classics, economics, trade skills, poetry, literature and civic virtue have been debated since at least the time of ancient Greece. Brilliant philosophers, thinkers, writers, poets and teachers over the past twenty-five centuries have dedicated their talents to identifying the best means of providing a proper education to help each child reach his or her highest potential in a just society. In a republican form of government founded on democratic rule, it must be the elected representatives and executives who make the difficult and profound decisions regarding how our children are to be educated.[131]

These observations ring true, but they are not what this case is about.

The plaintiffs in this case are not asking the court to determine in the abstract "what is the best means of providing a proper education," nor are they asking the court to decide what Delaware's schools should teach. The plaintiffs advance the more limited claim that that the Education Clause has something to say about education and that the concept of a general and efficient system of public schools contemplates actual schooling. For purposes of this case, the plaintiffs argue that Delaware's system of public schools can and should be evaluated using the standards that the Delaware Department of Education has established for grade-level proficiency. This approach seems intuitively fair, since it only

---

[131] *Citizens for Strong Sch., Inc. v. Fla. State Bd. of Educ.*, 232 So. 3d 1163, 1166 (Fla. Dist. Ct. App. 2017), *review granted*, 2018 WL 2069405 (Fla. 2018).

seeks to apply the standards that the Delaware Department of Education has chosen for itself.[132] The plaintiffs also contend that the court can address what they view as irrational allocations of financial and educational resources, in which more state funding goes to wealthier school districts, less state funding goes to poorer school districts, and Disadvantaged Students do not receive the additional resources they need to succeed despite a state-level consensus that additional resources are required. These arguments are more limited than the free-wheeling philosophical expositions that the State fears.

Notably, the State does not dispute that the complaint alleges facts sufficient to support a claim that Delaware's public schools are not providing an adequate education to Disadvantaged Students. The State responds instead that Count I should be dismissed because the Education Clause does not require an adequate or effective education. Thus, if the Education Clause contains a qualitative requirement, then it is undisputed that Count I pleads sufficiently that the State has failed to meet it.

The threshold issue for the motion to dismiss is therefore whether the Education Clause has any qualitative component. There does not appear to be any Delaware precedent on point, giving rise to a question of first impression.

---

[132] This approach also has the benefit of echoing conceptually the standard for a "free appropriate public education" under Section 504 of the Rehabilitation Act of 1973, which defines that phrase as an education and related services that "meet the standards of the State educational agency." 20 U.S.C. § 1401(9). In a Section 504 case, the standards adopted by the State educational agency are applied to an individual student. In this case, the standards adopted by the State educational agency will be applied to Disadvantaged Students as a whole.

The Delaware Supreme Court has held that when interpreting a constitutional provision, "[t]he question is: What did the delegates to the Constitutional Convention of 1897 intend . . . ?"[133] The attempt to answer that question "begins with that provision's language itself."[134] If the meaning of a constitutional provision is unclear, then the court may consider "the legislative history of our 1897 Constitution."[135] The court may also consider discussion or commentary from other Delaware precedent, even if they do not directly answer the question presented.[136] Finally, this decision considers how other jurisdictions have interpreted similar clauses in their own constitutions that were adopted during the same generative period as the Education Clause.

Taken together, these sources convince me that the Education Clause has a qualitative dimension. Put differently, the Education Clause obligates Delaware to maintain a system of public schools that meets a constitutionally mandated level of educational adequacy. That does not mean that the judiciary gets to sit as a super legislature or school board on high. In my view, a court should measure Delaware's public schools against the standards that the political branches have established, at least absent an egregious scenario involving a demonstrated failure by the political branches to establish

---

[133] *In re Request of Governor for Advisory Op.*, 950 A.2d 651, 653 (Del. 2008).

[134] *Id.*

[135] *Id.*

[136] *Id.* (interpreting phrase in constitutional provision and observing that "we next turn to precedent to help us").

meaningful standards. A court must also take into account and afford due deference to the political branches' efforts to address the multi-faceted and ever-evolving challenges inherent in designing and implementing an educational system. No system will be perfect. Ultimately, however, the Education Clause contains a qualitative component, and a complaint can state a claim for a violation of the Education Clause if it sufficiently alleges (as is undisputed here) that the State has failed to meet it.

### 1. The Plain Language Of The Education Clause

Under the plain language of the Education Clause, the State must create a system of public schools that educates Delaware's children. In full, the Education Clause states:

> The General Assembly shall provide for the establishment and maintenance of a general and efficient system of free public schools, and may require by law that every child, not physically or mentally disabled, shall attend the public school, unless educated by other means.[137]

The clause thus both (i) mandates that the General Assembly establish and maintain a "general and efficient system of free public schools" and (ii) contemplates that the General Assembly may require "every child" to attend those schools "unless educated by other means." By deploying a compound verb ("shall provide" and "may require"), the drafters established a clear connection between the "system of free public schools" and the outcome of children being "educated." The purpose of the former is to produce the latter. For that reason, the "unless" language in the Education Clause permits children to be exempted from attending the State's public schools if they are "educated by other means."

---

[137] Del. Const. art. X, § 1.

Even without the condition addressing "educat[ion] by other means," the goal of providing an education is inherent in the concept of a school. The Delaware Supreme Court has held that language in a constitutional provision should be afforded "its ordinary and natural meaning."[138] In a case involving a statute that used the term "school," the Delaware Supreme Court held that its ordinary and natural meaning "refers to the 'organized body' of students, faculty, administrators and employees who come together as a community to engage in the 'act or process' of education."[139] The high court further explained that the ordinary and natural meaning of "education" is "the 'act or process' of educating or learning."[140] Schools are places where the process of learning takes place. They exist to provide students with an education.

Dictionary definitions similarly support the instrumental linkage between a "system of free public schools" and the goal of educating students. The Delaware Supreme Court has explained that "[b]ecause dictionaries are routine reference sources that reasonable persons use to determine the ordinary meaning of words, we often rely on them for

---

[138] *State v. Highfield*, 152 A. 45, 51 (Del. 1930); *accord Forbes v. State*, 43 A. 626, 628 (Del. 1899) (examining the "natural and ordinary meaning" of a constitutional phrase).

[139] *New Castle Cty. Dept. of Land Use v. Univ. of Del.*, 842 A.2d 1201, 1207 (Del. 2004) (emphasis omitted). The decision involved whether space that the University of Delaware leased in its student center to a bank was being used for a "school purpose" so as to be exempt from taxation by New Castle County. *See id.* at 1203–04.

[140] *Id*. at 1207.

57

assistance in determining the plain meaning of undefined terms."[141] In *Black's Law Dictionary*, the first definition for the word "school" is "[a]n institution of learning and education, esp. for children."[142] Dictionaries published in the last decades of the nineteenth century—the era when the Education Clause was adopted—likewise connect the definition of "school" to the goals of learning and education:

- "An institution of learning of a lower grade, below a college or a university. A place of primary instruction."[143]

---

[141] *Freeman v. X–Ray Assocs.*, 3 A.3d 224, 227–28 (Del. 2010); *accord Lorillard Tobacco Co. v. American Legacy Found.*, 903 A.2d 728, 738 (Del. 2008); *see State ex rel. Morford v. Tatnall*, 21 A.2d 185, 191 (Del. 1941).

[142] *School*, BLACK'S LAW DICTIONARY (8th ed. 2004); *accord School*, BLACK'S LAW DICTIONARY (5th ed. 1979) ("An institution or place for instruction or education."). Other modern dictionaries provide similar definitions. *See School*, Dictionary.com, https://www.dictionary.com/browse/school (last visited Nov. 19, 2018) ("1. an institution where instruction is given, especially to persons under college age: *The children are at school*."); *School*, Merriam-Webster, https://www.merriam-webster.com/dictionary/school (last visited Nov. 19, 2018) ("1: an organization that provides instruction: such as **a :** an institution for the teaching of children"); WEBSTER'S ELEVENTH NEW COLLEGE DICTIONARY 988 (1999) ("1. An institution for the instruction of children."); WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1051 (1990) ("1: an organization that provides instruction: as **a:** an institution for the teaching of children . . . ."); WEBSTER'S NEW WORLD DICTIONARY 1274 (2d Coll. ed. 1986) ("**1.** a place or institution for teaching and learning; establishment for education; specif., *a*) an institution for teaching children . . . .").

[143] John Bouvier, 2 A LAW DICTIONARY, ADAPTED TO THE CONSTITUTION AND LAWS OF THE UNITED STATES OF AMERICA, AND OF THE SEVERAL STATES OF THE AMERICAN UNION 613 (1883); *accord* Henry Campbell Black, A DICTIONARY OF LAW CONTAINING DEFINITIONS OF THE TERMS AND PHRASES OF AMERICAN AND ENGLISH JURISPRUDENCE, ANCIENT AND MODERN INCLUDING THE PRINCIPAL TERMS OF INTERNATIONAL, CONSTITUTIONAL, AND COMMERCIAL LAW 1064 (1891).

- "[A] place for instruction : an institution of learning, esp. for children . . . ."[144]

- "1. A place or establishment in which persons are instructed in arts, science, languages, or any species of learning . . . ."[145]

- "1. An educational institution: in the widest sense including all establishments for systematic instruction of every kind and grade, from universities and colleges to establishments for teaching riding and dancing. Especially: (1) Any institution of elementary instruction below the college or university . . . ."[146]

It is not possible to divorce a mandate to establish and maintain a system of public schools from the expectation that the schools will educate the students who attend them.[147]

Rather than focusing on the central concept of "schools," the parties have debated the meaning of "general and efficient." In my view, by examining these terms in isolation, they miss the bigger and more important picture. The Education Clause is not concerned with generality or efficiency as goods in themselves. The Education Clause deploys these terms instrumentally in service of a "system of free public schools." The terms do not limit

---

[144] THE AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 379 (Daniel Lyons ed., 1892).

[145] John Ogilvie, THE COMPREHENSIVE ENGLISH DICTIONARY: EXPLANATORY, PRONOUNCING, & ETYMOLOGICAL 941 (1879).

[146] 2 A STANDARD DICTIONARY OF THE ENGLISH LANGUAGE 1597 (Isaac K. Funk et al. ed., 1895); *accord* Stewart Rapalje & Robert L. Lawrence, 2 A DICTIONARY OF AMERICAN AND ENGLISH LAW 1152 (1888).

[147] *See* Joshua E. Weishart, *Aligning Education Rights and Remedies*, 27 Kan. J.L. & Pub. Pol'y 346, 360–61 (2018) [hereinafter *Aligning Education*] ("Surely the reason to command the state to educate children is tied inexorably to the instrumental and intrinsic value of an education. This explains why courts interpret state constitution education clauses that simply mandate the establishment of a free, public education system to require that the education provided be of a certain quality." (footnotes omitted)).

the meaning of a school but rather describe two essential means by which the system should educate students: it should generally cover all students and efficiently accomplish the task of providing them with an education.

If I nevertheless focus on these terms, they support the existence of a qualitative dimension to the Education Clause. The Delaware Supreme Court has interpreted the term "general" to mean "state-wide and uniform."[148] For that reason, the plaintiffs do not cite this term as the source of a qualitative dimension. The plaintiffs instead contend that that the term "efficient" contemplates a qualitative component. The State disagrees, contending that the term contemplates only managerial and administrative efficiency.

Dictionary definitions establish that the ordinary and natural meaning of the term "efficient" encompasses the concept of effectiveness, which incorporates a qualitative component. *Black's Law Dictionary* defines efficient as "[c]ausing an effect; particularly the result or results contemplated. Adequate in performance or producing properly a desired effect."[149] Dictionaries published in the last decades of the nineteenth century similarly define "efficient" as "effective" or "causing or producing an effect":

- "1. Acting or having power to act effectually; having all the energy or power requisite; competent; as, an *efficient* helper; an *efficient* leader. 2. Having or exercising the power to produce effects or results; actively causative."[150]

---

[148] *Brennan v. Black*, 104 A.2d 777, 783 (Del. 1954).

[149] *School*, BLACK'S LAW DICTIONARY (6th ed. 1990).

[150] A STANDARD DICTIONARY OF THE ENGLISH LANGUAGE 377 (1894).

60

- "1. Producing outward effects; of a nature to produce a result; active; causative. 2. Acting or able to act with due effect; adequate in performance; bringing to bear the requisite knowledge, skill, and industry; capable; competent; as, an *efficient* workman, director, or commander."

- "Causing effects; actively operative." [151]

- "1. Causing or producing effects or results; acting as the cause of effects; effective."[152]

- "Causing effects; producing results; actively operative or capable."[153]

By directing the General Assembly to establish an "efficient system of free public schools," the Education Clause calls for a system that will produce educated students.

The plain language of the Education Clause thus contains a qualitative component: It requires a system of free public schools that provides an education to the students who attend them. If the political branches create and maintain a system that falls demonstratively short in its task, then a constitutional violation exists.

## 2. Legislative History

The legislative history of the Education Clause confirms the preceding plain meaning analysis. Examining the history of public education in Delaware pre-dating Delaware's current constitution reveals a decentralized system in which schools of widely

---

[151] WEBSTER'S ACADEMIC DICTIONARY, DICTIONARY OF THE ENGLISH LANGUAGE 189 (1895).

[152] Robert Hunter, THE AMERICAN ENCYCLOPAEDIC DICTIONARY 1599 (1897).

[153] WEBSTER'S COLLEGIATE DICTIONARY: A DICTIONARY OF THE ENGLISH LANGUAGE 283 (1898). In its compendium, the State collected additional dictionary definitions from the period. *See* Dkt. 49. Those definitions confirm this interpretation.

varying quality did not educate Delaware's children effectively. During the constitutional convention, the delegates sought to address this problem. They adopted the Education Clause and instructed the General Assembly to create a general and efficient system of public schools for the purpose of providing a meaningful education to Delaware's children.

### a.  Delaware's Schools Before The Constitution of 1897

Delaware has had four constitutions, adopted respectively in 1776, 1792, 1831, and 1897. The last continues in force today. They are not separate and independent, but rather linked. After the adoption of the first constitution in 1776, "[e]ach subsequent Delaware constitution has provided for a revision of the existing government rather than making a fundamental change."[154] Delaware's current constitution reflects "a 'layering' of the concerns of successive generations."[155]

The state's first constitution, adopted on September 20, 1776, did not address education or public schools.[156] The state's second constitution, adopted in 1792, stated that "[t]he Legislature shall, as soon as conveniently may be, provide by law . . . for establishing schools, and promoting arts and sciences."[157] It thus gave the legislature the power to create

---

[154] Maurice A. Hartnett, III, *Delaware's Charters and Prior Constitutions*, *in* FIRST ONE HUNDRED YEARS, *supra*, at 23.

[155] Randy J. Holland, *State Constitutions: Purpose and Function in* FIRST ONE HUNDRED YEARS, *supra*, at 19 (quoting Robert F. Williams, STATE CONSTITUTIONAL LAW: CASES & MATERIALS 19 (2d ed. 1993)).

[156] Del. Const. of 1776.

[157] Del. Const. of 1792, art. VIII, § 12.

public schools, but afforded "some discretion" as to how and when to exercise this power.[158]

Exercising its discretion, the General Assembly passed legislation in 1795 that established the "School Fund," financed from sales of public lands and from the proceeds of tavern and marriage licenses.[159] Appropriations from the School Fund were first made in 1817, but only for educating poor children; parents of means were expected to send their children to private schools.[160] The School Fund thus paid for the education of individuals, not for the creation of a system of public schools.

The original system was generally regarded as a failure, and efforts to organize a public school system began as early as 1817.[161] During the next decade, Delaware's governors advocated for a system of public schools that would educate all children.[162] In

---

[158] Sacks, *supra*, at 169.

[159] *Id.*

[160] *Id.* at 169–70.

[161] Stephen B. Weeks, HISTORY OF PUBLIC SCHOOL EDUCATION IN DELAWARE 23–38 (1917).

[162] *See id.* at 29 (describing speech given by Governor John Collins on January 2, 1822, that "emphasize[d] the importance of 'devising the best practical means of promoting education,' for on it 'depends the intellectual, moral, and religious character of the community'"); *id.* at 29–30 (describing Governor Collins's comments on the inadequacy of the School Fund, in which he observed that "[t]he charitable nature of the appropriations and the benevolent views with which they are made command our esteem, but it is wisdom to consider that the general purposes of education in which the whole community are interested demand more than our school fund can afford." (internal quotation marks omitted)); *id.* at 30 (describing Governor Caleb Rodney's advocacy of education legislation in 1823); *id.* (citing Governor Charles Thomas's plea in 1824 that the General Assembly

1829, after a committee of the General Assembly concluded that Delaware's public schools were profoundly inadequate,[163] the General Assembly adopted an "act for the establishment of free schools."[164] The 1829 legislation divided each county into incorporated school districts, administered by an annually elected clerk and two commissioners, and overseen by unsalaried county superintendents.[165] The statute was amended in 1830 to authorize school districts to raise funds by taxing local property, but only with the approval of a majority of the voters and subject to a cap on the amount raised.[166]

---

"adopt[] some plan by which the means of education may be accessible to every member of the community" (internal quotation marks omitted)); *id.* at 38 (describing Governor Charles Polk's call for education reform in 1829).

[163] *See id.* at 31 (citing committee's findings that "in some neighborhoods there were no schools," while in others the schools were "the most unprosperous state"); *id.* at 32 (noting that expenditures from the School Fund had been made "for the education of poor children without materially promoting their instruction" and that students were taught "for such short and irregular periods that they could not have made any sensible progress in acquiring a knowledge of the first rudiments of learning").

[164] *See Husbands v. Talley*, 47 A. 1009, 1010 (Del. Super. 1901) (in banc) (internal quotation marks omitted) (describing history of public education in Delaware); *see also* Sacks, *supra*, at 170 ("[I]n 1829, school laws were passed which provided for the establishment of school districts for the general population of white children, controlled and financed by local school committees."); William W. Boyer & Edward C. Ratledge, DELAWARE POLITICS & GOVERNMENT 97 (2009) ("There were no public schools in Delaware until the General Assembly passed its first school law in 1829, which provided only for the education of white children.").

[165] *Husbands*, 47 A. at 1010; Weeks, *supra*, at 43.

[166] Weeks, *supra*, at 41.

In 1831, Delaware adopted its third constitution. This iteration did not make any changes to the provision addressing public schools.[167]

By 1833, more than 133 school districts had been organized across the state.[168] But despite having the power to tax, the districts struggled to raise revenue because of the need for voters to pass referendums.[169] The schools also suffered from a lack of statewide organization. "Every school district had the absolute power of saying whether it should have a good school, a poor school, or no school, and there was no one to say them nay."[170] During the 1850s, critics argued for reform.[171]

---

[167] Del. Const. of 1831, art. VII, § 11.

[168] Weeks, *supra*, at 44.

[169] *Id.* at 48–49.

[170] *Id.* at 49.

[171] *See id.* at 65–66 (Governor P. F. Carney arguing in 1859 that "[o]ur State at ought once to be redivided into school districts, and every district provided without delay with a properly constructed schoolhouse and fixtures, and a teacher capable of instructing in all the branches of a thorough and substantial English education. . . . This subject . . . has been the theme of much debate in our legislative halls for many years, and yet each succeeding session has ended in little or no alteration for the better" (internal quotation marks omitted)); *see id.* at 66 (Governor William F. Burton lamenting in 1859 that "the last census tells the sad tale that there are in Delaware 4,536 . . . persons who can neither read nor write" (internal quotation marks omitted)); *id.* at 68 (A.H Grimshaw, county superintendent of New Castle schools, writing in 1854 in the *Delaware School Journal*: "The people of this State need to be awakened . . . . First we need good schoolhouses . . . . Second we need good teachers . . . . Third we need school libraries . . . . Fourth we need a revision of the school law . . ." (internal quotation marks omitted)).

In 1861, the General Assembly provided for a mandatory tax levy in each county to establish a minimum level of support for the schools.[172] In 1875, the General Assembly took a step towards centralization by establishing a state superintendent and a state board of education.[173] The practical effects of these measures were limited.[174] In 1887, the General Assembly returned to the "older individualistic county system."[175]

The situation had not improved by 1896. As one scholar noted, "Matters could hardly be worse. . . . The system was without system."[176] "[E]ducation remained a highly local matter subject to the vagaries and tender mercies of local public opinion."[177] "There

---

[172] *See Husbands*, 47 A. at 1011; Weeks, *supra*, at 74.

[173] *See Husbands*, 47 A. at 1011; Weeks, *supra*, at 85.

[174] *See* Weeks, *supra*, at 108.

[175] *Id.* at 108–09.

[176] *Id.* at 122.

[177] Paul Dolan & James R. Soles, GOVERNMENT OF DELAWARE 163 (1976). In 1937, the Delaware Supreme Court described the history of Delaware's public schools in a similar vein, writing:

> For years the school laws of the State were in the utmost confusion, without symmetry or order, and entirely insufficient to secure an efficient administration of a public school system and to afford an equality of opportunity for learning. It was a patch-work system, characterized by hesitation and vacillation, and fostered by opportunism. In some districts, buildings were adequate and schools were efficient; in others, the conditions were entirely unsatisfactory and insufferable.

*DuPont v. Mills*, 196 A. 168, 177 (Del. 1937) (in banc).

was too much freedom; every county superintendent was a law unto himself; in matters of finance every school committee was a law unto itself. There was insufficient supervision and therefore little opportunity to locate and remedy weaknesses."[178]

### b. The Constitutional Convention of 1896–97

On May 7, 1895, the General Assembly called for a constitutional convention to commence on December 8, 1896.[179] Thirty delegates attended, ten chosen from each county.[180] The delegates included ten lawyers, "three physicians, two preachers, several farmers, and business persons of all stripes."[181] The convention lasted from December 1896 to June 1897. The new constitution took effect on June 10, 1897.[182]

The delegates created ten standing committees to accomplish the work of the convention, but the ten did not include a committee on education.[183] On December 10, 1896, James B. Gilchrist moved for the creation of "a special committee of three" called the "Committee on Education." The delegates approved the motion, and the committee's

---

[178] Weeks, *supra*, at 123.

[179] Henry R. Horsey, Henry N. Herndon, Jr., & Barbara MacDonald, *The Delaware Constitutional Convention of 1897: December 1, 1897–June 4, 1897*, in FIRST ONE HUNDRED YEARS, *supra*, at 58.

[180] *Id.* at 58; *see* Dolan & Soles, *supra*, at 14 (describing composition of delegates).

[181] Horsey et al., *supra*, at 60.

[182] Dolan & Soles, *supra*, at 14.

[183] Horsey et al., *supra*, at 61.

members comprised Gilchrist, Ezekiel W. Cooper, and Andrew L. Johnson.[184] On January 4, 1897, again on Gilchrist's motion, the Committee on Education was converted into a six-member Standing Committee, with Isaac K. Wright, Nathan Pratt, and Elias N. Moore joining as additional members.[185]

In its first report to the convention, the Committee on Education proposed a draft of what became Article X. The draft contained six sections, the first of which consisted of a hortatory preamble:

> A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the General Assembly shall encourage by all suitable means the promotion of intellectual, scientific and agricultural improvement.[186]

The substance of the current Education Clause appeared in Section 4 of the committee's draft. It stated:

> The General Assembly shall within two years after this Constitution goes into effect, provide for a general and uniform system of free public schools throughout the State; and may require by law that every child, not physically or mentally disabled shall attend the public school, unless educated by other means.[187]

---

[184] 1 DEBATES AND PROCEEDINGS OF THE CONSTITUTIONAL CONVENTION OF THE STATE OF DELAWARE 101, 106–07, 109 (1958) [hereinafter DEBATES].

[185] *Id.* at 156, 165, 246.

[186] 2 DEBATES, *supra*, at 1153.

[187] *Id.* at 1154.

In February 1897, the delegates to the Convention debated the draft, sitting as the Committee of the Whole.[188]

The first point of debate was a proposal to eliminate the hortatory preamble in Section 1. Future Justice William Spruance moved to substitute the following language: "It shall be the duty of the General Assembly to provide for the establishment and maintenance of a general, suitable and efficient system of free schools."[189] He explained that he did not know of any "encouragement" that the General Assembly should be providing "except the establishment of schools."[190] Other delegates shared his view.[191]

Woodburn Martin questioned whether the constitution should address education at all, noting that the General Assembly had passed legislation creating a public school system.[192] Spruance agreed that the General Assembly had done so, but observed that "whether they have done all that they ought to have done, I am not prepared to say."[193]

---

[188] *Id.* at 1204–05.

[189] *Id.* at 1212.

[190] *Id*.

[191] *See id.* at 1215 (William Saulsbury: "I believe the only sort of free instruction that the people of Delaware want to establish is an efficient and capable free school system wherein only the branches of knowledge which all the people need will be taught . . . .").

[192] *See id.* at 1213.

[193] *Id.*

Martin pointed out that the General Assembly "could make it better now if they desire."[194]

Spruance again agreed but explained that the constitutional provision would make it "a duty."[195]

Martin continued to argue that the provision was unnecessary.[196] At this point, Pratt jumped in, citing his personal experience with Delaware's ineffective public schools:

> [I]f there ever was anything incompatible, conglomerated and impossible or incapable of being understood or being determined without the greatest difficulty, it is our present school system. At every session of the Legislature it is altered or amended in some way. No school district knows whether it has the same laws as any other school district. The effort is to introduce some particular system and to base the system upon some formulated plan, restrained within limits. There is no regularity about it.
>
> Ever since 1875 . . . I have been identified with the public school system . . . , doing whatever I could to advance the interests of the people in that regard, but I have found it a mighty maze, without a plan, and it is to be hoped that this Convention will formulate something better, on which some efficient system of legislation and management can be based.[197]

---

[194] *Id.*

[195] *Id.* (Spruance: "Oh yes, but it only enjoins upon the general Legislature something that we recognize as a duty . . . .").

[196] *Id.* at 1215 ("My position in reference to this matter is the same as it has been on several other attempts to codify the Constitution. It seems to me that the section is entirely unnecessary. It says that the Legislature shall do what it already is doing now and has been doing for a number of years past. It does provide for a public school system; it has provided for maintaining a public school system; it has carried that out as far as it could, and will continue to do so.").

[197] *Id.* at 1216.

Charles Richards sided with Martin, arguing that the legislature already had the power to act and that Spruance's language would not add anything meaningful.[198] Spruance again disagreed, explaining that his provision deployed simple mandatory language.[199]

The discussion next turned to the adjectives that Spruance had proposed: "general, suitable and efficient."[200] William Saulsbury argued that the system should not be general because "[t]he laws must vary" in different parts of the state.[201] He posited that the only adjective should be "suitable."[202] Pratt responded that while the details in particular areas might differ, the objective was "so far as the taxes and the distribution of the funds go, [to have] a system that shall be uniform."[203] He believed that the constitutional provision needed to contain language that would "be a guide to the Legislature towards uniformity."[204]

---

[198] *See id.*

[199] *See id.* at 1216–17 (Spruance comparing his proposed education clause with Pennsylvania and New York's clauses and contrasting it with those of Arkansas, Minnesota and Nevada).

[200] *Id.* at 1218.

[201] *Id.*

[202] *Id.* (Saulsbury: "I think the word 'suitable' is all we want. It has to vary. A little district in the rural part of New Castle County could not maintain a system like that of the City of Wilmington.").

[203] *Id.*

[204] *Id.*

At this point, Martin piped in with his own objection to the adjectives. Martin was a lawyer, and he foresaw possible litigation over their meaning: "I do not believe that we want to leave this Constitutional question open as to what is a suitable system, in case you go into Court. What is an efficient system?"[205] Vigorous debate ensued, with Martin and Saulsbury arguing that the adjectives should be omitted.[206] Saulsbury moved to amend Spruance's language to strike "general," but the delegates rejected the motion.[207] Without additional substantive discussion, the Committee of the Whole adopted Spruance's proposed language for Section 1: "The General Assembly shall provide for the establishment of a general, suitable and efficient system of free schools."[208]

Later in the day, the Committee of the Whole took up Section 4. Several delegates noted that the first part of the proposed section, which instructed the General Assembly to establish a system of free public schools, had now been adopted as Section 1. The real question was what to do with the second part of the proposed section, which authorized the General Assembly to require that students attend public school "unless educated by other means."[209] Spruance moved to strike the first part, which was now redundant, and keep the

---

[205] *Id.*

[206] *See id.* at 1218–19.

[207] *Id.* at 1219.

[208] *Id.* at 1220 ("Upon a division, the amendment was adopted.").

[209] *See id*. at 1234.

72

second part.[210] The delegates regarded striking the first part as non-controversial, and they approved it.[211] But they hotly debated the language authorizing compulsory education.[212] Martin saw no need for it because the General Assembly already had the power to impose compulsory education.[213] Cooper responded that compulsory education should be required to ensure that the State's citizens could vote and participate in the democratic process.[214] Contrasting the provision with the requirement to establish and maintain a system of public schools, Cooper acknowledged that the provision was not mandatory, but believed the section would encourage the legislature to act.[215] Other delegates, including Spruance, agreed that it was beneficial language.[216] The delegates also supported moving the language to Section 1.[217]

Before voting, the delegates confirmed their understanding that the language on compulsory education authorized the General Assembly to take this step, but did not

[210] *Id.*

[211] *See id.* at 1238 (noting that this aspect of the motion prevailed).

[212] *See id.* at 1238–48.

[213] *Id.* at 1240.

[214] *Id.* at 1241.

[215] *See id.*

[216] *See id.* at 1243–47 (comments of Spruance and Richards).

[217] *See id.* at 1245.

require it. They contrasted this language with the General Assembly's obligation to provide a system of public schools, which they agreed was mandatory.[218] Having underscored this point, the chairman called the question. The motion carried.[219] As a result, Article X, Section 1 read as follows: "The General Assembly shall provide for the establishment of a general, suitable and efficient system of free schools, and may require by law that every child, not physically or mentally disabled shall attend the public school, unless educated by other means."

Between April 20 and May 20, 1897, the Committee on Phraseology and Arrangement reviewed the draft constitution. Its charge was "without changing the meaning, [to] correct verbal mistakes or inaccuracies in the various provisions acted upon by the Committee of the whole."[220] Without debate, the Committee on Phraseology

---

[218] *See id.* at 1246–47.

[219] *Id.* at 1246–48. During their debates on Article X, Section 2, the delegates again stressed the mandatory nature of the Education Clause. *See id.* at 1371 (Spruance: "We have already done that [*viz.* required the General Assembly to maintain and therefore fund public schools], Mr. Chairman, in the first section . . . . The General Assembly is not only advised to do it, but required to do it."); *id.* at 1372 (Spruance noting that the constitution "enjoined upon the Legislature the duty of maintaining the system" and therefore "all other expenses must be provided as the General Assembly shall direct").

[220] JOURNAL OF THE CONSTITUTIONAL CONVENTION: STATE OF DELAWARE 1896–1897 at 247 (1897) [hereinafter JOURNAL]; *see also* 4 DEBATES, *supra*, at 2564 (Spruance reporting on the progress of the Committee on Phraseology and Arrangement and stating that "[a]ll the provisions recommended from the old Constitution and all the reports have been taken up and the thing has been collated and arranged into articles and sections. This, of course, required considerable transposition in certain cases and striking out repetitions and putting in provisions that would save the necessity of repeating the same thing in different connections . . . . But . . . there are some matters of substance which it is obvious

dropped the adjective "suitable."[221] On May 20, 1897, the convention adopted the Education Clause.

### c.    Implications From The Legislative History

The legislative history indicates that the Education Clause was intended to mandate the creation of a system of public schools that would provide a meaningful education to Delaware's children.[222] The delegates sought to mandate the creation of "an efficient and capable free school system" that would "teach those things which are proper to be taught for the general education of the people."[223] The clause requires not just a system of public schools, but a "good system of public schools."[224]

Contrary to the defendants' contention, the delegates did not weaken the Education Clause to cater to opponents like Martin and Saulsbury. Martin did not want to include

---

ought to be changed and which we have not the authority to change without the approval of the Convention.").

[221] *See* JOURNAL, *supra*, at 309, 352 (introducing the report from the Committee on Phraseology and Arrangement containing the final language for Article X).

[222] *See* Sacks, *supra*, at 170 ("The framers of the Delaware constitution [of 1897] were clearly in favor of an educated citizenry, since their original draft of Section 1 of the new article on education explicitly underscored the importance of education in a democracy . . . .").

[223] 2 DEBATES, *supra*, at 1213; *see id.* at 1215 (Saulsbury agreeing that the system of public schools should teach "the branches of knowledge which all people need"); *see also id.* at 1241 (Cooper addressing the need for compulsory schooling for "children so as to prepare them, when they come of age, to enjoy the elective franchise").

[224] *Id*. at 1372.

anything in the constitution about public schools, arguing that the General Assembly already had the ability to establish public schools. The delegates rejected that position. Martin and Saulsbury later argued for eliminating some or all of the adjectives in Spruance's proposal, and Saulsbury moved to strike the word "general." The delegates rejected the motion and adopted Spruance's proposal.

Contrary to the defendants' view, the delegates did not strike the hortatory preamble because they did not want schools to provide a meaningful education. The delegates rejected the preamble because (i) it called for the General Assembly to encourage knowledge through means other than schools, (ii) it singled out particular fields of technical study, and (iii) other sections of the constitution did not have similar introductions.[225]

Contrary to the defendants' argument, the elimination of the word "suitable" from the list of adjectives does not suggest that the delegates had no interest in the quality of the system. The Committee on Phraseology struck the word "suitable" as part of its charge to make non-substantive edits to streamline the text. If anything, the Committee's action implies that the delegates already believed that the Education Clause required "suitable" schools, either because the concept was inherent in the idea of a school or conveyed by the commonly understood meaning of efficiency.

The legislative history demonstrates that the drafters of the Education Clause did not envision a school system without educational substance. They would not have believed,

---

[225] *See id.* at 1213 (Spruance); *id.* at 1215 (Saulsbury).

as the defendants argue, that the Education Clause has nothing to say about education, other than it be general (in the sense of statewide) and efficient (in the sense of generating cost-savings). They intended for their mandate to have a qualitative dimension.

### 3. Delaware Precedents Interpreting The Education Clause

The Delaware Supreme Court has indicated that a court seeking to apply a constitutional provision should consider existing precedent. In this case, there does not appear to be any decision that addresses whether the Education Clause has a qualitative dimension.

In 1901, the Education Clause made its first appearance in a judicial decision.[226] Shortly after the Constitution of 1897 was ratified, the General Assembly sought to fulfill the Education Clause's mandate by adopting "[a]n act concerning the establishment of a general system of free public schools."[227] Exercising authority granted by the act, a school district levied a tax for the construction of a new school. A property owner challenged the tax under a prior law that had limited the amount of the levy.[228] The Delaware Superior Court, sitting in banc, explained that "[t]he proper determination of the sole question directed to be heard here will be found in the careful examination of the provisions of the act of 1898 in connection with the antecedent legislation relating to the gradual evolution

---

[226] *Husbands*, 47 A. at 1009.

[227] *See id.* at 1013 (internal quotation marks omitted).

[228] *Id.* at 1009.

and development of free public school education in this state."[229] After conducting a thorough and scholarly review, the Superior Court held that the 1898 act repealed prior laws by implication, including the earlier limitation on taxation.[230] As additional support for its analysis, the decision touched on the Education Clause, explaining:

> In corroboration of the view that the act of 1898 was designed to provide a general system of free public schools, and thus to supersede and be a general substitute for the previous legislation, it is important to remember that the general assembly met that year, in adjourned session, for the especial purpose of enacting subject legislation as might be required by the express mandates or the effective operation of the new state constitution of 1897. It is significant that said act of 1898 was promptly passed in obedience to the express mandate of the new constitution, contained in [the Education Clause]. . . . These educational provisions of the new constitution seem to import a constitutional design that a new and more liberal and efficient general system of free schools should be created in lieu of the preexisting system. The enactment of the law of 1898 is evidence of the legislative purpose to fulfill such design. As the result of our consideration of this act and of the legislative purpose respecting it, we conclude that it was designed to provide a complete general system for the government and administration for the free public schools of the state, and was intended to be a complete revision of the prior general free public school laws, and a consolidation and codification of them, which such new provisions as were deemed advantageous, in a single act designed to cover the whole subject in all respects, and to be a substitute for all antecedent general free school legislation not incorporated therein or continued in force thereby, as essential to its effective operation.[231]

The court was not called upon to and did not address whether the Education Clause had a qualitative component.

---

[229] *Id.*

[230] *Id.* at 1013.

[231] *Id.* at 1014.

The Delaware Supreme Court first considered the implications of the Education Clause in 1921, in response to a request by Governor John G. Townsend, Jr. for an opinion on the constitutionality of the School Code of 1919.[232] The governor asked the Delaware Supreme Court to address whether school districts created under the School Code or ratified by it were validly established, or whether the districts also had to comply with another provision in the Constitution of 1897 which required that all corporations be formed under the Delaware General Corporation Law and not by special act.[233] The General Assembly had relied on the Education Clause when enacting the School Code, so the high court examined whether the School Code fell within the scope of that clause. The high court concluded that it did, reasoning as follows:

> The Act in question was passed pursuant to the mandate contained in [the Education Clause].
>
> To be constitutional it must have been general. To be general it must provide for free public schools for all of the children of the State. A general law providing for the establishment and maintenance of a system, uniform or otherwise, of free public schools and made applicable to every school district, town or city, incorporated or otherwise, without the consent and even against the will of such school district, town or city, would if properly enacted be a valid exercise of this constitutional mandate. Such an Act would overrule and annul the provisions relating to free public schools contained in acts relating to school districts, incorporated and unincorporated, and to incorporated Boards of Education.[234]

---

[232] *In re School Code of 1919*, 108 A. 39 (Del. 1919).

[233] *See id.* at 41.

[234] *Id.* at 41.

Having found that the General Assembly had the constitutional power to act, the Delaware Supreme Court readily rejected a series of other challenges to the statute.

Unfortunately, this decision provides little guidance for the current case. It makes clear that the General Assembly has broad power over the education system, and it sheds light on the concept of generality, but it does not address whether the Education Clause has a qualitative dimension. The request for an advisory opinion only asked the high court to review the School Code for purposes of the challenges presented. The Delaware Supreme Court was not presented with an as-applied challenge to the functioning of Delaware's system of public schools based on allegations that the system fails to provide a meaningful education to broad swathes of students.

In 1954, the Delaware Supreme Court addressed the Education Clause as part of its multifaceted decision in *Brennan v. Black*.[235] The plaintiff in that case brought an array of challenges against a local property tax that a school district levied after a referendum. In one of the challenges, the plaintiff argued the Education Clause required property tax rates to be state-wide and uniform, claiming that different local tax levies resulted in unequal levels of taxation across districts that violated the Education Clause.[236] After characterizing this argument as "diffuse" and "not wholly clear,"[237] the high court rejected it as

---

[235] 104 A.2d 777 (Del. 1954).

[236] *Id.* at 385–87.

[237] *Id.* at 390-91.

ignor[ing] the fundamental basis of the State's education system. The basis consists of the establishment by the General Assembly of minimum standards of financial support and of administration of the school system throughout the State, supplemented by additional local financing to the extent approved by the local districts. The *Debates of the Constitutional Convention of 1897*, referenced by plaintiff, lend no support whatever to the suggestion that the members of the constitutional convention, in seeking to establish a state-wide educational system, were attempting to do away with the local school districts or the raising of additional school funds in those districts in such amounts as they might determine.

Uniformity in administrative matters was no doubt sought and, as is well known, has now been largely achieved. But uniformity in respect of local taxation was not envisaged; indeed, the opposite inference is the reasonable one.

There is no constitutional requirement that the rate of taxation in the local districts shall be uniform.[238]

Based on this language, the State contends that the Education Clause only requires "[u]niformity in administrative matters" and does not have any qualitative component. But the Delaware Supreme Court did not have to consider whether the clause incorporated a qualitative component. The high court diligently addressed *seriatim* the issues raised by a frustrated taxpayer, whose lawyers seemingly advanced every argument they could muster in an effort to set aside a referendum. The taxpayer did not argue about whether the Education Clause has a qualitative component, which was irrelevant to her challenge, and the Delaware Supreme Court did not rule on that question.

In 1968, the Delaware Supreme Court issued a second advisory opinion regarding the Education Clause, this time in response to a request from Governor Charles L. Terry,

---

[238] *Id.* at 391–92.

Jr.[239] The General Assembly had adopted legislation that reorganized school districts across the state. The newly combined districts were responsible for debts of the constitutive districts. Opponents of the act contended that this step was unconstitutional and imposed burdens of debt and tax liability upon residents without due process. The Delaware Supreme Court rejected this challenge:

> The General Assembly, by [the Education Clause], is directed to provide for the establishment of a general system of free public schools for the State. In following the mandate thus imposed upon it, the General Assembly may, in its wisdom, use any device appropriate to the end as long as the scheme adopted is of general application throughout the State. In so doing, it may abolish existing agencies and choose new agencies and means to accomplish the desired end. The prior existence of school districts, or of existing statutes, does not restrain the General Assembly in the exercise of that power.
>
> \*     \*     \*
>
> Thus, it is clear, the pattern of laws heretofore existing in this State establishing a public school system are not binding on the General Assembly. It may change them freely in its wisdom. The fact that, heretofore, no consolidating of districts or imposition of taxes could be made without an affirmative vote of the residents of the particular district, does not mean that ever thereafter the General Assembly is bound to preserve that practice. The preservation or abolition for referenda is a matter of policy left to the discretion of the General Assembly. [240]

The Delaware Supreme Court also rejected contentions that the General Assembly had improperly delegated its power to the State Board of Education, that the legislation was

---

[239] *See Op. of Justices*, 246 A.2d 90 (Del. 1968).

[240] *Id.* at 92–93.

82

invalid because it addressed more than one subject, and that the legislation impaired the obligation of contracts protected by the United States Constitution. [241]

As with the advisory opinion rendered in 1921, the opinion from 1968 provides little guidance for the current case. It confirms that the General Assembly has broad power over the education system, but it does not consider whether the Education Clause has a qualitative dimension. The request asked the high court to consider five legal questions. The Delaware Supreme Court was not presented with an as-applied challenge to the functioning of Delaware's system of public schools.

In 1979, the Delaware Superior Court ruled on whether a school district could invoke sovereign immunity in a personal injury action that accused the school district of negligence.[242] In one of their arguments against sovereign immunity, the plaintiffs argued that the doctrine did not apply to school districts, contending that "local school districts, as they have evolved under Delaware law, are more analogous to political subdivisions," which had been denied the defense of sovereign immunity.[243] The Superior Court agreed, reasoning as follows:

> In Delaware, school districts function to discharge the State's commitment to operate a free public school system. While [the Education Clause] requires that the General Assembly provide for such a system, the method and format of the system is not prescribed. The General Assembly has elected to delegate certain aspects of this function to certain non-corporate public bodies

---

[241] *See id.* at 93–96.

[242] *Beck v. Claymont Sch. Dist.* 407 A.2d 226, 227 (Del. Super. 1979).

[243] *Id.* at 228.

subdivided on a geographic basis with certain policy powers reserved to a supervisory state agency, the State Board of Education. For the most part, the governing bodies of local school districts are elected by the residents of the various districts. Subject to State guidelines, school board members may set tax rates; issue bonds and pledge the full faith and credit of the district, but not the state; condemn property; hire employees and establish their pay scale; and enter into collective bargaining agreements. On the fiscal level, the local boards have broad discretion in expending funds to maintain and protect school property.

Although there is a sharing of educational and fiscal policy with the State, the school district functions as a separate political entity. . . . As noted, the General Assembly is free to adopt any format to provide a general educational system in the State and, presumably, could have done so directly and exclusively through State agencies. It has, however, elected to share that responsibility with local political subdivisions, conferring upon them certain incidents of sovereignty.[244]

The State suggests that this passage support its position in this case, particularly the Superior Court's observations that the Education Clause does not prescribe "the method and format" of Delaware's system of public schools and that the General Assembly "is free to adopt any format to provide a general educational system in the State." Both observations are true, but that does not foreclose a qualitative component. The Education Clause obligates the State of Delaware to create and maintain a system of public schools that successfully educates Delaware's students. The Education Clause grants the State broad discretion over the means it chooses to achieve this end, as long as it achieves that end. The issue in this case is whether the means that the State has chosen is achieving that end for Disadvantaged Students.

---

[244] *Id.* at 228–29 (citations and footnotes omitted).

There are other Delaware cases that the parties have cited, but they add little to the mix. Two correctly cite the broad authority that the General Assembly possesses under the Education Clause.[245] Another observes that "merely because an education program may be imperfect does not render it constitutionally invalid."[246] Although that decision addressed a challenge brought under the federal equal protection clause, the observation applies equally to the Education Clause and to the claims asserted in this case.

Existing Delaware precedent simply does not address whether the Education Clause has a qualitative dimension. The issue presented in this case is one of first impression.

### 4. Other States' Interpretations Of Comparable Education Clauses

Every state's constitution has a provision addressing education.[247] Except for Mississippi's, every state's constitution mandates, at a minimum, that the state maintain a system of free public schools.[248] As of 2013, courts in thirty-one states had held that the

---

[245] *See DuPont*, 196 A. at 172 ("It will be agreed that the Legislature, under [the Education Clause], has, subject to certain exceptions, plenary power over free public schools; and that, with respect to the building of a school house and the manner and method of defraying its cost, the defendant school district is subject to that power."); *Corder v. City of Milford*, 196 A.2d 406, 407 (Del. Super. 1963) ("The Supreme Court has described [the Education Clause] as granting plenary power over free public schools to the General Assembly and has stated that the building of a schoolhouse is subject to that power.").

[246] *Plitt v. Madden*, 413 A.2d 867, 871 (Del. 1980).

[247] Sara Aronchick Solow & Barry Friedman, *How to Talk About the Constitution*, 25 Yale J.L. & Human. 69, 86 & n.94 (2013). The State created a helpful chart that collects the provisions from all fifty states, identifies the current language, and provides the language as it existed in 1897. *See* Dkt. 25.

[248] William E. Thro, *A New Approach to State Constitutional Analysis in School Finance Litigation*, 14 J.L. & Pol. 525, 538 (1998) [hereinafter *New Approach*]. Article

85

education clauses in their state constitutions contained a quantitative component and mandated a minimally adequate education.[249] Because the constitutional provisions differ in their language, this decision looks for persuasive authority in those jurisdictions that adopted provisions similar to the Education Clause during the wave of state constitutional reform that swept over the United States during the second half of the nineteenth century.

### a. Types of Education Clauses

Scholars who analyze education clauses in state constitutions classify them into four categories.[250]

---

VIII, Section 201 of the Mississippi Constitution states: "The Legislature shall, by general law, provide for the establishment, maintenance and support of free public schools upon such conditions and limitations as the Legislature may prescribe." The express delegation to the legislature of the power to determine the "conditions and limitations" for the free public schools distinguishes the provision from those of the other forty-nine states.

[249] Solow & Friedman, *supra*, at 86; *see* Anne Gordon, *California Constitutional Law: The Right to an Adequate Education*, 67 Hastings L.J. 323, 352–53 (2016) ("[O]nly a minority of states have found that their education clauses confer no substantive right. Where a state's high court has found a right to education, none has found that right to exist without a guarantee of quality.")

[250] *See* William E. Thro, *Judicial Analysis During the Third Wave of School Finance Litigation: The Massachusetts Decision as a Model*, 35 B.C.L. Rev. 597, 606 (1994) [hereinafter *Judicial Analysis*]; Gershon M. Ratner, *A New Legal Duty for Urban Public Schools: Effective Education in Basic Skills*, 63 Tex. L. Rev. 777, 814 (1985); Erica Black Grubb, *Breaking the Language Barrier: The Right to Bilingual Education*, 9 Harv. C.R.-C.L.L. Rev. 52, 66–70 (1974). *See generally* William S. Koski, *Of Fuzzy Standards and Institutional Constraints: A Re-Examination of the Jurisprudential History of Educational Finance Reform Litigation*, 43 Santa Clara L. Rev. 1185, 1231–32 (2003) (identifying different historical trends that generated the differing clauses).

In a later article, Thro proposed collapsing the third and fourth categories into a single type. *See* Thro, *New Approach*, *supra*, at 539 n.34. Because of the similarity between Category II and Category III provisions, and because the additional language in Category

- Category I clauses impose "an explicit but unelaborated commitment" to establish a system of public schools.[251] For example, Connecticut's constitution states: "There shall always be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation."[252]

- Category II clauses require that the system of public schools have identified characteristics. For example, they typically require that the system be "efficient," often that it be "general," "thorough," or "uniform," and sometimes that it be "suitable."[253] New Jersey's clause is representative: "The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public

---

III provisions is typically hortatory rather than mandatory, I would combine those categories and keep the first and fourth categories separate. *Cf.* Grubb, *supra*, at 68 (noting close relationship between Categories II and III).

[251] Grubb, *supra*, at 67; *see* Thro, *Judicial Analysis*, *supra*, at 606 & n.55 (citing then-operative provisions in constitutions of Alabama, Alaska, Arizona, Connecticut, Hawaii, Kansas, Louisiana, Massachusetts, Nebraska, New Mexico, New York, North Carolina, Oklahoma, South Carolina, Tennessee, Utah, and Vermont). For reasons discussed later, I believe the then-operative Arizona and New Mexico provisions closely resembled the Education Clause and should be placed in Category II. I believe North Carolina's provision warrants placement in Category III or even Category IV. There is a clause in the North Carolina constitution that calls for generality and uniformity, suggesting Category II treatment. *See* N.C. Const. art. IX, § 2 ("The General Assembly shall provide by taxation and otherwise for a general and uniform system of free public schools . . . ."). But this provision follows an introductory provision characteristic of a Category III clause. *See id.* art. IX, § 1 ("Religion, morality, and knowledge being necessary to good government and the happiness of mankind, schools, libraries, and the means of education shall forever be encouraged."). And North Carolina's Bill of Rights addresses education, suggesting that the combination deserves Category IV treatment. *See id.* art. I, § 15 ("The people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right.").

[252] Conn. Const. art. VIII, § 1*; see* Ratner, *supra*, at 815 (citing Connecticut provision as a representative Category I provision).

[253] *See* Thro, *Judicial Analysis*, *supra*, at 606 & nn. 56-57 (citing provisions in constitutions of Arkansas, Colorado, Delaware, Florida, Idaho, Illinois, Kentucky, Maryland, Minnesota, Montana, North Dakota, New Jersey, Ohio, Oregon, Pennsylvania, Texas, Virginia, West Virginia, and Wisconsin); Grubb, *supra*, at 65–66.

schools for the instruction of all the children in the State between the ages of five and eighteen years."[254]

- Category III provisions resemble Category II provisions, "but two characteristics make the textual commitment to education stronger."[255] They typically add supplemental mandates, such as a direction to use "all suitable means" to encourage or promote education. They also tend to include a preamble that emphasizes the importance of education.[256] Indiana's clause is representative:

  Knowledge and learning, generally diffused throughout a community, being essential to the preservation of a free government; it shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement; and to provide, by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all.[257]

- Category IV clauses go the furthest and make education the "primary," "fundamental," or "paramount" duty of the state legislature, implying that the needs of the state's public schools must come before other needs.[258] For example the Washington Constitution states: "It is the paramount duty of the state to make ample

---

[254] N.J. Const. art. VIII, § 4, ¶ 1; *see* Ratner, *supra*, at 815 (citing New Jersey provision as representative of Category II).

[255] Grubb, *supra*, at 68.

[256] *Id.* at 68–69; *see* Thro, *Judicial Analysis*, *supra*, at 606 (citing provisions in constitutions of California, Indiana, Iowa, Nevada, Rhode Island, South Dakota, and Wyoming).

[257] Ind. Const. art. VIII, § 1.

[258] Grubb, *supra*, at 69; *see* Thro, *Judicial Analysis*, *supra*, at 606 (citing then-operative provisions in constitutions of Georgia, Illinois, Maine, Michigan, Missouri, New Hampshire, and Washington). At times, the additional language appears in a separate constitutional provision that is not included on the State's chart. *See* Dkt. 25.

provision for the education of all children residing within its borders, without distinction or preference on account of race, color, caste, or sex."[259]

The different framing of the education clauses could readily lead courts to reach different results when applying the provisions.[260]

---

[259] Wash Const. art. IX, § 1; *see* Ratner, *supra*, at 816 (citing Washington provision as a representative Category IV provision).

[260] Thro, *Judicial Analysis*, *supra*, at 606. Thro argues that a court should not find a qualitative component in a Category I clause because those clauses "do not specify any level of quality." *Id.* Other scholars disagree. For example, Grubb observes that "[d]espite the simplicity of these provisions, they are substantive state obligations written in the most fundamental body of state law." Grubb, *supra*, at 67. Ratner takes a similar view: "All four categories impose duties on the state to provide some form of public education. Even the weakest provision compels states to maintain free public schools." Ratner, *supra*, at 816.

In my opinion, as this decision discussed when analyzing the plain language of the Education Clause, even Category I provisions incorporate a qualitative component because they call for establishing a system of public schools, and some minimum level of educational effectiveness is inherent in the concept of schooling. Consistent with this view and contrary to Thro's thesis, courts in at least thirteen of the seventeen states that he identified as having Category I provisions have held that their provisions incorporate a qualitative component. *See Op. of Justices*, 624 So.2d 107, 110 (Ala. 1993); *Roosevelt Elem. Sch. Dist. No. 66 v. Bishop*, 877 P.2d 806, 823 (Ariz. 1994); *Conn. Coal. for Justice in Educ. Funding, Inc. v. Rell*, 990 A.2d 206, 270 (Conn. 2010); *Montoy v. State*, 112 P.3d 923, 925 (Kan. 2005); *McDuffy v. Sec'y of Exec. Office of Educ.*, 615 N.E.2d 516, 547–48 (Mass. 1993); *Gould v. Orr*, 506 N.W.2d 349, 353 (Neb. 1993); *Hoke Cty. Bd. of Educ. v. State*, 599 S.E.2d 365, 373–74 (N.C. 2004); *Campaign for Fiscal Equity, Inc. v. State*, 801 N.E.2d 326, 327–29 (N.Y. 2003); *Abbeville Cty. Sch. Dist. v. State*, 767 S.E.2d 157, 159 (S.C. 2014); *Tenn. Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 140–41 (Tenn. 1993); *Brigham v. State*, 692 A.2d 384, 386 (Vt. 1997). *See generally* Meira Schulman Ferziger, *Validity of Public School Funding Systems*, 110 A.L.R. 5th 293 (2003 & Supp. 2011) (collecting cases). Because these decisions establish a majority rule holding that weaker Category I provisions encompass a qualitative component, they support the conclusion in this case that Delaware's stronger Category II provision incorporates a qualitative component.

When considering precedent from other states, it is important to understand what type of education clause the court was interpreting. Delaware's Education Clause is a center-of-the-fairway Category II provision. To determine whether it incorporates a qualitative component, this opinion looks to decisions from other jurisdictions that have considered Category II provisions that were adopted during the same historical period.

There are sixteen states that adopted provisions resembling the Education Clause after the Civil War and before the turn of the twentieth century: Ohio (1851), Minnesota (1857), Maryland (1867), Illinois (1870), West Virginia (1872), Pennsylvania (1874), Arkansas (1874), New Jersey (1875), Colorado (1876), Texas (1876), Florida (1885), South Dakota (1889), Montana (1889), Wyoming (1889), Idaho (1890), and Kentucky (1891).

For purposes of analyzing precedent, this decision omits Montana, Florida, and Illinois. Montana's education clause originally resembled Delaware's,[261] but the state revised its clause substantially in 1972.[262] After the revision, the Montana Supreme Court

---

[261] Mont. Const. of 1889, art. X, § 1 ("It shall be the duty of the legislative assembly of Montana to establish and maintain a general, uniform and thorough, system of public, free common schools.").

[262] Mont. Const. of 1972, art. X, § 1 ("(1) It is the goal of the people to establish a system of education which will develop the full educational potential of each person. Equality of educational opportunity is guaranteed to each person of the state. . . . (3) The legislature shall provide a basic system of free quality public elementary and secondary schools. . . . It shall fund and distribute in an equitable manner to the school district's the state's share of the cost of the basic elementary and secondary school system.").

held that the education clause had a qualitative component.[263] At that point, however, the significant textual differences between the two clauses weaken the persuasiveness of the Montana case for purposes of interpreting the Education Clause.

Florida's clause is *sui generis*, both because its development followed a unique course early on and because the clause was subsequently amended in 1968 and 1998.[264]

---

[263] *See Columbia Falls Elem. Sch. Dist. No. 6 v. State*, 109 P.3d 257, 260–61 (Mont. 2005) (holding state's system for funding public schools constitutionally inadequate and school's educational output constitutionally inadequate, as demonstrated by accreditation problems, difficulty retaining teachers, cuts in programming, and deteriorating facilities).

[264] The Florida Constitution of 1868, adopted after the Civil War during the era of Reconstruction, contained a particularly strong educational mandate: "It is the paramount duty of the State to make ample provision for the education of all the children residing within its borders, without distinction or preference." Fla. Const. of 1868, art. VIII, § 1. The next section stated: "The Legislature shall provide a uniform system of common schools, and a university, and shall provide for the liberal maintenance of the same. Instruction in them shall be free." *Id.* § 2. Seventeen years later, the Florida Constitution of 1885 eliminated the first clause, leaving a shortened version of the second: "The Legislature shall provide for a uniform system of public free schools, and shall provide for the liberal maintenance of the same." Fla. Const. of 1885, art. XII, § 1. The Florida Constitution of 1968 revised the clause yet again so that it read: "Adequate provision shall be made by law for a uniform system of free public schools and for the establishment, maintenance and operation of institutions of higher learning and other public education programs that the needs of the people may require." Fla. Const. of 1968, art. IX, § 1(a). In 1998, the clause was amended by voter referendum to state:

> The education of children is a fundamental value of the people of the State of Florida. It is, therefore, a paramount duty of the state to make adequate provision for the education of all children residing within its borders. Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education and for the establishment, maintenance, and operation of institutions of higher learning and other public education programs that the needs of the people may require.

The extant opinions deal with the later versions of the clause and conflict on key points, with the Florida Supreme Court having accepted jurisdiction in a recent case.[265]

Illinois's clause is also distinguishable. The original provision from 1870 contained Category II terminology that called a "thorough and efficient system," but it went further by instructing the legislature to create a system of public schools "whereby all children of this State may receive a good common school education."[266] In 1970, Illinois replaced its education clause with a new provision that required the state to "provide for an efficient system of high quality public educational institutions and services."[267] The new provision

---

Fla. Const. art. IX, § 1(a). The current clause goes so far as to specify maximum class sizes for particular grades and to require "a high quality pre-kindergarten learning opportunity in the form of an early childhood development and education program . . . ." *Id.* art. IX, § 1(b).

[265] The Florida Supreme Court held that the 1968 clause "requires that a system be provided that gives every student an equal chance to achieve basic educational goals prescribed by the legislature." *St. Johns Cty. v. Ne. Fla. Builders Ass'n*, 583 So. 2d 635, 641 (Fla. 1991). A subsequent Florida Supreme Court decision accepted that the clause contained an adequacy requirement, but held that the complaint in the case before it had not sufficiently pled a violation. *See Coal. for Adequacy & Fairness in Sch. Funding, Inc. v. Chiles*, 680 So. 2d 400, 408 (Fla. 1996). After that decision, the voters amended the Florida constitution to strengthen the clause. Notwithstanding that amendment, a Florida intermediate court subsequently held that Florida's education clause was not judicially enforceable. *See Citizens for Strong Sch.*, 232 So. 3d at 1170. That decision is currently on appeal.

[266] Ill. Const. of 1870, art. VIII, § 1 ("The general assembly shall provide a thorough and efficient system of free schools, whereby all children of this State may receive a good common school education.").

[267] Ill. Const. of 1870, art. VIII, § 1 ("A fundamental goal of the People of the State is the educational development of all persons to the limits of their capacities. The State

thus reinforced and strengthened the qualitative component, and case law interpreting the provision does not provide meaningful insight into whether a qualitative component should otherwise exist.[268]

An argument could be made for including Arizona and New Mexico. The constitutions of both states contained Category II provisions when they were admitted to the Union in 1912, within what historians think of as the "long nineteenth century" (1776–1914).[269] Arizona's original constitution contained a provision resembling the Education Clause,[270] and the Arizona Supreme Court held that this provision contained a qualitative component.[271] The same is true for New Mexico.[272] Including these jurisdictions would reinforce the conclusion that this decision already reaches.

---

shall provide for an efficient system of high quality public educational institutions and services.").

[268] As discussed below, Illinois is one of only five jurisdictions where the state's highest court has held its education clauses to be non-justiciable. *See Comm. for Educ. Rights v. Edgar*, 672 N.E.2 1178, 1993 (Ill. 1996).

[269] *See* Eric J. Hobsbawm, THE AGE OF EMPIRE: 1875–1914 at 8 (1987).

[270] *See* Ariz. Const. of 1912, art. XI, § 1 ("The Legislature shall enact such laws as shall provide for the establishment and maintenance of a general and uniform public school system, which system shall include kindergarten schools, common schools, high schools, normal schools, industrial schools, and a university.").

[271] *See Hull v. Albrecht*, 950 P.2d 1141, 1145 (Ariz. 1997) (*en banc*); *see also Roosevelt Elem.*, 877 P.2d at 815–16. In 2000, Arizona's education clause was substantially revised. *See* Ariz. Const. art. XI, § 1(A).

[272] *See* N.M. Const. art. XII, § 1 ("A uniform system of free public schools sufficient for the education of, and open to, all the children of school age in the state shall be established and maintained."); *Martinez v. State*, No. D-101-CV-2014-0093, slip op. at 74

### b. The Thirteen Jurisdictions

Omitting Illinois, Montana, and Florida leaves thirteen jurisdictions that adopted Category II-style education clauses after the Civil War and before the turn of the twentieth century. The highest courts in all thirteen states have held that their education clauses contain a qualitative component. These include the highest courts in the states whose constitutions the delegates to the Convention of 1896–97 referenced during their debates over the Education Clause.

During the constitutional debates, delegate Spruance cited Arkansas as one of the models for the Education Clause.[273] The Arkansas clause reads: "Intelligence and virtue being the safeguards of liberty and the bulwark of a free and good government, the state shall ever maintain a general, suitable and efficient system of free public schools and shall adopt all suitable means to secure to the people the advantages and opportunities of education."[274] The Arkansas Supreme Court has held that this clause contains a qualitative component: "There is no question in this court's mind that the requirement of a general, suitable, and efficient system of free public schools places on the State an absolute duty to

(N.M. 1st Jud. Dist. Ct. July 20, 2018) (post-trial decision finding violation of New Mexico's education clause and giving state defendants "until April 15, 2019, to take immediate steps to ensure that New Mexico schools have the resources necessary to give at-risk students the opportunity to obtain a uniform and sufficient education that prepares them for college and career"), https://www.maldef.org/assets/pdf/2018-07-20d-101-cv-2014-00793_Decision_and_Order.pdf.

[273] 2 DEBATES, *supra*, at 1212.

[274] Ark. Const. art. 14, § 1.

provide the school children of Arkansas with an adequate education."[275] The court did not attempt to state what constituted an adequate education, but rather affirmed the trial court's application of specific standards that the court had developed to address the claims.[276]

During the constitutional debates, Spruance cited Minnesota as one of the precedents he considered when drafting the Education Clause, noting that it contained an introductory preamble that provided "a little bit of 4th of July oratory" that he found unnecessary.[277] The Minnesota clause states: "The stability of a republican form of government depending mainly upon the intelligence of the people, it is the duty of the legislature to establish a general and uniform system of public schools."[278] The Minnesota Supreme Court has held that this provision imposes an obligation to "ensure a regular method throughout the state, whereby all may be enabled to acquire an education which will fit them to discharge intelligently their duties as citizens of the republic."[279]

During the constitutional debates, Spruance cited Pennsylvania as a precedent for

---

[275] *Lake View Sch. Dist. No. 25 of Phillips Cty. v. Huckabee*, 91 S.W.3d 472, 492 (Ark. 2002).

[276] *See id.* at 485–86.

[277] 2 DEBATES, *supra*, at 1217.

[278] Minn. Const. art. XIII, § 1.

[279] *Cruz-Guzman v. State*, 916 N.W.2d 1, 9 (Minn. 2018) (quoting *Board of Educ. Of Town of Sauk Centre v. Moore*, 1871 WL 3277, at *4 (Minn. July 1, 1871)).

the Education Clause.[280] At that time, Pennsylvania's education clause stated: "The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public schools, wherein all the children of this Commonwealth above the age of 6 years may be educated, and shall appropriate at least one million dollars a year for that purpose."[281] After being revised in 1967, the clause currently states: "The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth."[282] The Supreme Court of Pennsylvania has held that the clause incorporates a qualitative component.[283] The court declined to spell out in the abstract what the qualitative standard was, choosing instead to remand the case so the trial court could develop standards to resolve the issues presented, taking into account both Pennsylvania's existing educational standards and other sources of authority.[284]

In Delaware's neighboring states of New Jersey and Maryland, the state supreme courts have likewise held that their respective education clauses contain a qualitative component. The New Jersey education clause states: "The Legislature shall provide for the

---

[280] 2 DEBATES, *supra*, at 1217.

[281] Pa. Const. of 1874, art. X, § 1.

[282] Pa. Const. art. III, § 14.

[283] *William Penn Sch. Dist. v. Pa. Dept. of Educ.*, 170 A.3d 414, 463–64 (Pa. 2017).

[284] *Id.* at 457.

maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years."[285] The New Jersey Supreme Court has held that its plain language contemplated "an equal educational opportunity for children."[286] The court later elaborated on this concept: "The Constitution's guarantee must be understood to embrace that educational opportunity which is needed in the contemporary setting to equip a child for his role as a citizen and as a competitor in the labor market."[287] In a subsequent decision, the New Jersey Supreme Court explained that the clause requires "a certain level of education, that which equates with thorough and efficient."[288]

In Maryland, the education clause states: "The General Assembly, at its First Session after the adoption of this Constitution, shall by Law establish throughout the State a thorough and efficient System of Free Public Schools; and shall provide by taxation, or otherwise, for their maintenance."[289] Maryland's highest court has held that the education clause has substantive content and requires that the General Assembly "establish a

---

[285] N.J. Const. art. VIII, § 4, ¶ 1.

[286] *Robinson v. Cahill*, 303 A.2d 273, 294 (N.J. 1973).

[287] *Id.* at 295.

[288] *Abbott v. Burke (Abbot I)*, 575 A.2d 359, 368 (N.J. 1990); *accord id.* ("[T]he clear import is not of a constitutional mandate governing expenditures per pupil, equal or otherwise, but a requirement of a specific substantive level of education.").

[289] Md. Const. art. VIII, § 1.

Statewide system to provide an adequate public school education to the children in every school district."[290]

The Ohio education clause states: "The general assembly shall make such provisions, by taxation or otherwise, as, with the income arising from the school trust fund, will secure a thorough and efficient system of common schools throughout the State . . . ."[291] The Supreme Court of Ohio has held that the clause did not permit a system in which "part or any number of the school districts of the state were starved for funds," nor one "in which part of any number of the school districts of the state lacked teachers, buildings, or equipment."[292]

The Kentucky education clause states: "The General Assembly shall, by appropriate legislation, provide for an efficient system of common schools throughout the state."[293] The Supreme Court of Kentucky has held that the clause has substantive content and

---

[290] *Montgomery Cty. v. Bradford*, 691 A.2d 1281, 1284 (Md. 1997); *see also Hornbeck v. Somerset Cty. Bd. of Educ.*, 458 A.2d 758, 780 (Md. 1997) (entering judgment for defendants where plaintiffs failed to prove or allege that "these qualitative standards were not being met in any school district, or that the standards failed to make provision for an adequate education, or that the State's school financing scheme did not provide all school districts with the means essential to provide the basic education contemplated by [Maryland's education clause]").

[291] Ohio Const. art. VI, § 2.

[292] *Cincinnati Sch. Dist. Bd. of Educ. v. Walter*, 390 N.E.2d 813, 825 (Ohio 1979) (internal quotation marks omitted); *accord DeRolph v. State*, 677 N.E.2d 733, 742–46 (Ohio 1997).

[293] Ky. Const. § 183.

requires that the General Assembly provide every Kentucky student with "equal opportunity" to receive an "adequate education."[294] The court went on to define an "efficient system" of education as one that includes eight minimum characteristics[295] and "has as its goal the development of seven capacities."[296]

The West Virginia education clause states: "The Legislature shall provide, by general law, for a thorough and efficient system of free schools."[297] The Supreme Court of

---

[294] *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 211–13 (Ky. 1989).

[295] *Id.* at 212–13 ("1) The establishment, maintenance and funding of common schools in Kentucky is the sole responsibility of the General Assembly. 2) Common schools shall be free to all. 3) Common schools shall be available to all Kentucky children. 4) Common schools shall be substantially uniform throughout the state. 5) Common schools shall provide equal educational opportunities to all Kentucky children, regardless of place of residence or economic circumstances. 6) Common schools shall be monitored by the General Assembly to assure that they are operated with no waste, no duplication, no mismanagement, and with no political influence. 7) The premise for the existence of common schools is that all children in Kentucky have a constitutional right to an adequate education. 8) The General Assembly shall provide funding which is sufficient to provide each child in Kentucky an adequate education.").

[296] *Id.* at 212 ("(i) sufficient oral and written communication skills to enable students to function in a complex and rapidly changing civilization; (ii) sufficient knowledge of economic, social, and political systems to enable the student to make informed choices; (iii) sufficient understanding of governmental processes to enable the student to understand the issues that affect his or her community, state, and nation; (iv) sufficient self-knowledge and knowledge of his or her mental and physical wellness; (v) sufficient grounding in the arts to enable each student to appreciate his or her cultural and historical heritage; (vi) sufficient training or preparation for advanced training in either academic or vocational fields so as to enable each child to choose and pursue life work intelligently; and (vii) sufficient levels of academic or vocational skills to enable public school students to compete favorably with their counterparts in surrounding states, in academics or in the job market.").

[297] W. Va. Const. art. XII, § 1.

Appeals of West Virginia held that the clause has substantive content and requires a system that "develops, as best the state of education expertise allows, the minds, bodies and social morality of its charges to prepare them for useful and happy occupations, recreation and citizenship, and does so economically."[298] The court also identified eight areas that an educational system needed to address.[299]

The Texas education clause states: "A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools."[300] The Supreme Court of Texas has declared that this provision has substantive content and requires that the legislature establish a system that will provide for a "general diffusion of knowledge." The court

---

[298] *Pauley v. Kelly*, 255 S.E.2d 859, 877 (W. Va. 1979).

[299] *Id.* ("Legally recognized elements in this definition are development in every child to his or her capacity of (1) literacy; (2) ability to add, subtract, multiply and divide numbers; (3) knowledge of government to the extent that the child will be equipped as a citizen to make informed choices among persons and issues that affect his own governance; (4) self-knowledge and knowledge of his or her total environment to allow the child to intelligently choose life work to know his or her options; (5) work-training and advanced academic training as the child may intelligently choose; (6) recreational pursuits; (7) interests in all creative arts, such as music, theatre, literature, and the visual arts; (8) social ethics, both behavioral and abstract, to facilitate compatibility with others in this society. Implicit are supportive services: (1) good physical facilities, instructional materials and personnel; (2) careful state and local supervision to prevent waste and to monitor pupil, teacher and administrative competency.").

[300] Tex. Const. art. VII, § 1.

disagreed with the state's interpretation of "efficient" as "a simple and inexpensive system" and held that the term means "effective or productive of results[,] connot[ing] the use of resources so as to produce results with little waste . . . ."[301]

Wyoming's education clause states:

The legislature shall provide for the establishment and maintenance of a complete and uniform system of public instruction, embracing free elementary schools of every needed kind and grade, a university with such technical and professional departments as the public good may require and the means of the state allow, and such other institutions as may be necessary.[302]

The Wyoming Supreme Court concluded that the clause has substantive content and requires the legislature "to provide an education system of a character which provides Wyoming students with a uniform opportunity to become equipped for their future roles as citizens, participants in the political system, and competitors both economically and intellectually."[303]

---

[301] *Edgewood Indep. Sch. Dist. v. Kirby*, 777 S.W.2d 391, 394–96 (Tex. 1989).

[302] Wyo. Const. art. VII, § 1.

[303] *Campbell Cty. Sch. Dist. v. State*, 907 P.2d 1238, 1259 (Wyo. 1995). In arriving at its conclusion, the Court defined "a complete and uniform system of public instruction" as "an organization forming a network for serving a common purpose of instructing/educating the public which organization has all the necessary parts or elements and has always the same form" and "a thorough and efficient system of public schools adequate to the proper instruction of the state's youth" as "an organization forming a network for serving the common purpose of public schools which organization is marked by full detail or complete in all respects and productive without waste and is reasonably sufficient for the appropriate or suitable teaching/education/learning of the state's school age children." *Id.* at 1258–59.

South Dakota's education clause states:

> The stability of a republican form of government depending on the morality and intelligence of the people, it shall be the duty of the Legislature to establish and maintain a general and uniform system of public schools wherein tuition shall be without charge, and equally open to all; and to adopt all suitable means to secure to the people the advantages and opportunities of education.[304]

The South Dakota Supreme Court held that this language guaranteed for the state's children "a free, adequate, and quality public education which provides them with the opportunity to prepare for their future roles as citizens, participants in the political system, and competitors both economically and intellectually."[305]

Colorado's education clause states: "The general assembly shall, as soon as practicable, provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state, wherein all residents of the state, between the ages of six and twenty-one years, may be educated gratuitously."[306] The Colorado Supreme Court has held that clause has substantive content, explaining that "the phrase 'thorough and uniform' in the Education Clause describes a free public school

---

[304] S.D. Const. art. VIII, § 1.

[305] *Davis v. State*, 804 N.W.2d 618, 641 (S.D. 2011). The court was ultimately unable to conclude that the state's "education funding system (as it existed at the time of trial) fail[ed] to correlate to actual costs or with adequate student achievement to the point of declaring the system unconstitutional." *Id.*

[306] Colo. Const. art. IX, § 2.

system that is of a quality marked by completeness, is comprehensive, and is consistent across the state."[307]

Idaho's education clause states: "The stability of a republican form of government depending mainly upon the intelligence of the people, it shall be the duty of the legislature of Idaho, to establish and maintain a general, uniform and thorough system of public, free common schools."[308] The Idaho Supreme Court held that the clause has substantive content and requires that state provide a "safe environment conducive to learning."[309] The Idaho Supreme Court has stressed that courts should give meaning to the requirement of a "thorough" system by looking to the executive branch's "promulgated educational standards pursuant to the legislative's directive . . . ."[310]

This brief survey of decisions from states with similar Category II provisions shows that courts have uniformly interpreted them as having a qualitative component. These decisions counsel in favor of holding that Delaware's Education Clause likewise has a qualitative component.

---

[307] *Lobato v. State*, 304 P.3d 1132, 1138 (Colo. 2013).

[308] Idaho Const. art. IX, § 1.

[309] *Idaho Sch. for Equal Educ. Opp. v. State (Idaho Schools III)*, 976 P.2d 913, 920 (Idaho 1998).

[310] *Idaho Sch. for Equal Educ. Opportunity v. Evans (Idaho Schools I)*, 850 P.2d 724, 734 (Idaho 1993).

### 5. The Qualitative Component And The Plaintiffs' Claims

The plain language of the Education Clause, its legislative history, and decisions from other states all point to the conclusion that the Education Clause has a qualitative component. The Education Clause requires that the General Assembly establish and maintain a system of public schools that lives up to that description in substance and not just in form.

From a linguistic standpoint, it is easiest to speak of this qualitative component using an adjective, such as an "adequate" or "meaningful" or "effective" education. Jurisprudentially, it is simplest to follow the lead of other courts and scholars who speak in terms of an "adequacy requirement." Recognizing that an adequacy requirement exists is only the first step. The more difficult question is how to implement it.

The parties have not devoted significant briefing to this issue. The State argued that the Education Clause did not contain an adequacy requirement. The State did not dispute that the complaint pled a violation in the event the court held that the Education Clause contained an adequacy requirement. The plaintiffs touched lightly on what adequacy means. They principally relied on the standards that the Delaware Department of Education has set for itself.

Courts in the thirteen Category II jurisdictions that have addressed the question of adequacy have taken different approaches. Some courts, like the Supreme Court of New Jersey, have framed a general definition:

> At its core, a constitutionally adequate education has been defined as an education that will prepare public school children for a meaningful role in society, one that will enable them to compete effectively in the economy and

104

to contribute and to participate as citizens and members of their communities.[311]

Others have adopted specific criteria.[312]

A third approach uses the existing standards adopted by the legislative or executive branches to define and measure adequacy.[313] In my view, this approach recognizes the

---

[311] *Abbott v. Burke*, 692 A.3d 417, 428 (N.J. 1997). Courts that have interpreted education clauses falling into other categories have also offered general definitions. *See, e.g.*, *Tenn. Small Sch. Sys.*, 851 S.W.2d at 150 (Category I); *Seattle Sch. Dist. No. 1 of King Cty. v. State*, 585 P.2d 71, 94–95 (Wash. 1978) (Category IV).

[312] *See, e.g.*, *Rose*, 790 S.W.2d at 212–13 (adopting eight minimum characteristics of an efficient system of education and seven capacities that a student should develop); *Pauley*, 255 S.E.2d at 877 (identifying eight areas that an efficient system of education should address). Courts that have interpreted education clauses falling into other categories have taken similar approaches. *See, e.g.*, *Claremont Sch. Dist. v. Governor*, 703 A.2d 1353, 1359 (N.H. 1997) (Category IV); *Hoke Cty.*, 599 S.E.2d at 381 (Category III); *Campaign for Fiscal Equity*, 801 N.E.2d at 330 (Category I); *Abbeville*, 515 S.E.2d at 540 (Category I).

[313] *See, e.g.*, *Idaho Schools III*, 976 P.2d at 919 (looking to "educational standards [promulgated] pursuant to the legislature's directive"); *Martinez v. State*, slip op. at 17–25 (assessing adequacy using statutes enacted by New Mexico legislature and regulations adopted by New Mexico Department of Education); *Pauley*, 255 S.E.2d at 878 (stating that "great weight will be given to legislatively established standards, because the people have reposed in that department of government 'plenary if not absolute' authority and responsibility for the school system"). Courts that have interpreted education clauses falling into other categories have looked to standards established by the political branches. *See, e.g.*, *Unified Sch. Dist. No. 229 v. State*, 885 P.2d 1170, 1186 (Kan. 1994) (interpreting Category I clause; explaining that a court can use "the standards enunciated by the legislature and the state department of education"); *Leandro v. State*, 488 S.E.2d 249, 259 (N.C. 1997) (interpreting Category III clause; citing the "[e]ducational goals and standards adopted by the legislature"); *McCleary v. State of Washington*, 269 P.3d 227, 246–47 (Wash. 2012) interpreting Category IV clause; measuring adequacy using the statutory and regulatory standards that the state had established in nine separate content areas). Scholars endorse it as well. *See* Joshua Kagan, *A Civics Action: Interpreting "Adequacy" in State Constitutions' Education Clauses*, 78 N.Y.U.L. Rev. 2241, 2248 (2003) (noting that courts

primacy of the political branches in this area. It also recognizes that the political branches are better suited to determine in the first instance the educational standards that schools must meet.

Consequently, I believe that the proper course in this case will be for the court to look first to the standards that the General Assembly and the Delaware Department of Education have chosen. The parties will have to establish what standards govern this case. The plaintiffs have alleged sufficiently for pleading purposes that the testing standards used to measure grade-level proficiency are a suitable metric to use. There are likely other components. For its part, the State suggested at the end of oral argument that the test standards did not measure grade-level proficiency, but were aspirational standards designed to push for greater student achievement. The statutory language directing the Delaware Department of Education to establish standards for grade-level proficiency does not support that contention,[314] but if it proves to be the case, I would take that into account.

At least one court has expressed concern about using standards developed by the political branches, both because it could constitutionalize the prevailing beliefs of the day

---

can "use existing legislative or executive standards to define and measure adequacy"); William F. Dietz, *Manageable Adequacy Standards in Education Reform Litigation*, 74 Wash. U.L.Q. 1193, 1194 (1996) ("[T]he proper approach to a judicial definition of educational adequacy is to adopt as mandatory the standards that the legislature and the educational bureaucracy have adopted for themselves in the form of accreditation standards or statutory statements of educational goals.").

[314] *See* 14 *Del. C.* § 153.

and render judicial review merely symbolic.[315] I do not believe that deferring to the political branches in the first instance would do that. This approach rather recognizes that educational standards change over time and that the political branches are best suited to keep up with the times. Judicial review also remains meaningful in cases like this one, where the plaintiffs contend that the State is failing to meet its own standards. Ultimately, if the political branches fail to adopt any standards at all, or if they implement unacceptably low standards, then the judiciary might be forced to establish a constitutional minimum. If the political branches decided that the dystopian hypothetical from the introduction provided an adequate education, a court would have the power and the duty to hold that the constitutional minimum requires more. But once the analysis moves away from the extremes, there remains a wide range for the exercise of legitimate discretion. Within those bounds, I believe a court should deploy the standards for educational adequacy that the political branches establish.

For purposes of the motion to dismiss Count I, the plaintiffs have pled sufficiently that Delaware's system of public schools fails to provide an adequate education to Disadvantaged Students. The complaint starts with educational outputs, alleging that Disadvantaged Students fail to achieve grade-level proficiency at shockingly low rates. The introduction and the Factual Background detail those statistics, which need not be

---

[315] *William Penn*, 170 A.3d at 459 ("Surely, it cannot be correct that we simply constitutionalize whatever standards the General Assembly relies upon at the moment in time, and then fix those as the constitutional minimum moving forward, if only because at that point our oversight function would become merely symbolic.").

repeated. Based on these results, Delaware is not fulfilling its constitutional obligation to Disadvantaged Students.

Although the allegations regarding educational outputs would be sufficient standing alone to state a claim, the complaint does not stop there. The allegations of the complaint describe shortages in critical educational inputs like financial resources, high-quality teachers, specialists and counselors, and textbooks. The Factual Background summarizes those allegations, which support a reasonable inference that the State is not providing Disadvantaged Students with sufficient educational inputs to receive an adequate education.

The complaint also discusses relative disparities between High-Need Schools and wealthier schools. In my view, when considering educational adequacy, a reviewing court should take into account not only absolute levels of educational inputs in particular school districts, but also relative levels of inputs across school districts. This is because education is both an absolute good, in that learning new facts or skills has value in its own right, and a relative good, in that the value of one's knowledge and skills depends to some degree on a comparison with others' knowledge and skills.[316] Particularly in the areas of financial

---

[316] *See* William S. Koski & Rob Reich, *When "Adequate" Isn't: The Retreat From Equity in Education Law and Policy and Why It Matters*, 56 Emory L.J. 546, 597–99, 612–16 (2006) (explaining why education has both absolute and relative value using the concept of a "positional good"; arguing that adequacy must take into account both absolute and relative measures; calling for "the setting of high and rigorous outcome standards paired with aggressive vertical equity of inputs in order to allow students with varying educational needs to reach these standards"); *see also* Joshua E. Weishart, *Equal Liberty In Proportion*,

resources and access to high-quality teachers, the complaint's allegations support a reasonable inference that the State is not providing Disadvantaged Students with sufficient educational inputs to receive an adequate education in a relative sense. To the contrary, the allegations of the complaint indicate that the State has established and maintained a counterintuitive system that provides more financial resources and high-quality teachers to wealthier, more privileged school districts, resulting in *de facto* discrimination against Disadvantaged Students.

The complaint further pleads that many Disadvantaged Students attend High-Need Schools that are effectively segregated by race and class. The Supreme Court of the United States held in *Brown* that a racially segregated education was inherently unequal, implying that it could not be adequate or effective.[317] The allegations of the complaint support a reasonable inference that Delaware's High-Need Schools, which are effectively segregated by race and class, do not provide an adequate education to the Disadvantaged Students who attend them.[318]

---

59 Wm. & Mary L. Rev. 215, 239–41, 286–92 (2017) (arguing that adequacy must include a dimension of vertical equity).

[317] *See* 347 U.S. at 494–95.

[318] Over the past three decades, the Supreme Court of the United States has limited the availability of desegregation remedies under the Equal Protection Clause to situations involving *de jure* segregation, while simultaneously restricting the remedial breadth of corrective measures to only those areas where *de jure* segregation existed. *See generally* Leland Ware & Cara Robinson, *Charters, Choice, and Resegregation*, 11 Del. L. Rev. 1, 6–7, 16 (2009). Those same limitations do not logically apply under the Education Clause, where the question is whether schools that are segregated by race and class can provide an

Count I pleads a violation of the Education Clause. The motion to dismiss Count I on this basis is denied.

## B.    Count II: The Specific Challenge To The State's Funding System

In Count II, the complaint challenges how Delaware allocates state funds to school districts, contending that the system fails to provide sufficient funding to enable property-poor school districts to provide an adequate education to Disadvantaged Students. To some degree, this theory overlaps with Count I, because inadequate funding contributes to the current state of educational inadequacy for Disadvantaged Students. In Count II, the plaintiffs mount a standalone challenge to the state-funding system.

As with its response to Count I, the State does not take on the plaintiffs' claim directly. Instead, the State re-characterizes it as a demand for equalized funding. In its opening brief, the State claimed the plaintiffs were seeking "equal per-pupil funding state-wide."[319] But the plaintiffs never argued that every pupil must have access to the same amount of funding. To the contrary, they contend that Disadvantaged Students require greater educational resources, and they believe the Education Clause mandates a funding

_____

adequate education for the students who attend them. *See Sheff v. O'Neill*, 678 A.2d 1267, 1280 (Conn. 1996); *see also* John C. Brittain, *Why* Sheff v. O'Neill *Is a Landmark Decision*, 30 Conn. L. Rev. 211, 211–212 (1997). *See generally* Jim Hilbert, *Restoring the Promise of* Brown: *Using State Constitutional Law to Challenge School Segregation*, 46 J. L. & Educ. 1, 1–3 (2017).

[319] DOB at 3; *accord id.* at 36, 76.

system in which pupils who need more funding receive more funding, not one in which every pupil receives the same funding.

The State also contends that Count II should be dismissed because Delaware law permits individual districts to tax themselves at higher rates if they wish to provide greater funding for education.[320] The plaintiffs do not dispute this point. They accept that individual districts can tax themselves at higher rates and generate more funding for their local schools.

Neither of the State's arguments for dismissal addresses the claim that the plaintiffs advance in Count II. Candidly, the plaintiffs could have done a better job spelling out their claim. The four paragraphs comprising Count II state:

> 181. A "general and efficient" system of public school is one where children are afforded a substantially equal opportunity to receive an adequate education, wherever they live.
>
> 182. A "general and efficient" system of public schools is one where local school districts have substantially equal access to similar revenues per pupil through a similar tax effort.
>
> 183. Delaware's system for funding schools is unconstitutional because it places an unreasonably heavy burden on taxpayers residing in school districts with low property values to provide sufficient resources to children in those districts.
>
> 184. Plaintiffs are entitled to an order that will require that Delaware cease its violation and meets its constitutional obligations.[321]

---

[320] *See id.* at 75-77 (discussing *Brennan*, 104 A.2d at 783-84).

[321] Compl. ¶¶ 181–84.

The plaintiffs' claim becomes more clear when these contentions are read in conjunction with the balance of the complaint and against the backdrop of judicial decisions from jurisdictions with similar Category II education clauses. Indeed, paragraph 182 of the complaint paraphrases a holding by the Supreme Court of Texas in a decision that upheld a successful challenge to a state financing system structurally similar to Delaware's: "There must be a direct and close correlation between a district's tax effort and the educational resources available to it; in other words, districts must have substantially equal access to similar revenues per pupil at similar levels of tax effort."[322]

The plaintiffs start with the basic proposition that a certain amount of funding is necessary for a school district to be able to provide a constitutionally adequate education to its students. That amount must take into account the nature of the student population, including the fact that Disadvantaged Students generally require greater levels of funding. They further argue that the Education Clause imposes the obligation to establish and maintain a general and efficient system of public schools *on the State*.[323] It does not impose

---

[322] *Edgewood*, 777 S.W.2d at 397. The Kansas Supreme Court subsequently adopted the same test. *See Gannon v. State*, 319 P.3d 1196, 1239 (Kan. 2014).

[323] *See, e.g., Robinson*, 303 A.2d at 294 ("Whether the State acts directly or imposes the role upon local government, the end product must be what the Constitution commands. A system of instruction in any district of the State which is not thorough and efficient falls short of the constitutional command. Whatever the reason for the violation, the obligation is the State's to rectify it."); *Edgewood*, 917 S.W.2d at 752 (noting that the Texas education clause "placed the burden on the State's Legislature to provide for the public schools"); *State v. Campbell Cty. Sch. Dist.*, 19 P.3d 518, 559 (Wyo. 2001) ("We again affirm that

the obligation on the local school districts. Consequently, if there are school districts that cannot provide an adequate education based on the amounts they are receiving, then the State must make up the difference. The plaintiffs then take the next logical step and contend that the inquiry should not be whether a school district could provide the necessary incremental resources under any circumstances, such as by enduring disproportionately high tax rates. The plaintiffs maintain that the residents of a property-poor district should not have to shoulder an excessively high tax burden.[324] They consequently contend that each district should have access to sufficient funds from the State to provide a constitutionally adequate education with a reasonable tax burden.

At this point, a simplified example may help. Assume that an adequate education requires average spending of $100 per student. Assume that the State provides funding equal to $60 per student, and that the federal government provides funding equal to another $10 per student. Further assume that the State has three districts that differ only in the value of their tax base.

- District 1 is wealthy. It generates another $50 per student through local taxes. The total of $130 per student enables District 1 to provide a better-than-adequate education. Because of its high-value tax base, District 1 can generate this amount while taxing its citizens at one percent of the total assessed value of their property.

- District 2 is poor. It generates another $10 per student through local taxes. The total of $80 per student results in an inadequate education. Because its tax base has one-

---

the state bears the burden of funding and providing constitutionally adequate facilities to school districts that provide an equal opportunity for a quality education.”).

[324] *See* Compl. ¶¶ 46–49.

tenth the value of District 1's, District 2 must tax its citizens at two percent of the total assessed value of their property to generate this inadequate amount.

- District 3 is also poor. It generates another $30 per student through local taxes, enabling it to provide an adequate education. Its tax base has the same value as District 2's, but its citizens are committed to education, and they pay taxes equal to ten percent of the total assessed value of their property.

The plaintiffs believe that the State must provide enough funds to District 2 so that it can provide an adequate education to its students. They also believe that the State must provide enough funds to District 3 so that it can provide its students with an adequate education at a lower level of taxation. As best I can tell, the plaintiffs are not contending that the State must provide the full $100 needed for educational adequacy, nor the $90 needed once federal funding is taken into account. In my view, that would be a more straightforward argument that comports with the State having the constitutional obligation to provide an adequate education. The plaintiffs instead contend that the State can provide something less than $100 per student and force the districts to make up the difference, as long as the resulting tax burden is not "unreasonably heavy."[325] The plaintiffs accept that District 1 will always have the ability to generate additional funds through local taxation and that *Brennan* permits District 1 to use those funds to provide a superior education for its students.

Interpreting similar arguments under comparable Category II provisions, courts in New Jersey, Ohio, and Texas have held that their state funding systems, which structurally

---

[325] *See* Compl. ¶ 183.

resembled Delaware's, violated their education clauses.[326] The plaintiffs' theory has legal

support that the State has not made any effort to rebut. The State's only response to Count

II was to mischaracterize the plaintiffs' theory.

The complaint's allegations are sufficient to state a claim under the plaintiffs'

theory. The complaint alleges that the State provides approximately 60% of the funding

that school districts need for their schools. Another 9% comes from the federal government.

The balance comes from the school districts.[327]

It is reasonable to infer that funding from the local districts is necessary to achieve

a constitutionally mandated minimum level of education. Under an arguable reading of the

Education Clause that imposes on the State the obligation to fund a minimally adequate

---

[326] *See Abbott I*, 575 A.2d at 370 (striking down state financing system where poor urban districts spent significantly less than wealthy districts and did not receive sufficient state funding to provide an adequate education); *Robinson*, 303 A.2d at 297–98 (holding state financing system unconstitutional where it had "no apparent relation to the mandate for equal educational opportunity"); *DeRolph*, 677 N.E.2d at 742–46 (holding state finance system unconstitutional where state failed to supply sufficient funding to enable poor districts to provide an adequate education); *Edgewood*, 777 S.W.2d at 393 (holding state school financing system unconstitutional based on wide disparities in spending where state did not allocate sufficient funding to provide adequate education in poorer districts); *see also Seattle*, 585 P.2d at 97 (holding financing system unconstitutional where complaining district was required to raise approximately one-third of its funding for maintenance and operations from a local levy). *Cf. Lake View*, 91 S.W.3d at 497–98 (affirming finding that state funding system did not provide adequate expenditures per student); *Davis*, 804 N.W. 2d at 633 (holding that it would violate education clause if state failed to provide sufficient funding to meet adequacy requirement and forced districts to rely on local referendums to raise funds "*necessary* to fund a constitutionally adequate school system in the district").

[327] Compl. ¶ 27.

education, this situation alone presents a constitutional violation.

Taking the plaintiffs' view that the State can offload part of its funding obligation onto local school districts as long as it does not result in an unreasonably heavy tax burden, the complaint's allegations still support a reasonable inference of a constitutional violation. The complaint alleges that Delaware's school districts vary widely in their ability to provide the incremental funding necessary to achieve adequacy and that some struggle to meet this threshold. The complaint cites a report from the State's Equalization Committee which found that if each local district taxed its property at a reasonable rate, the resulting funding available per unit of students would range from $28,896 to $103,248.[328] The Equalization Committee observed that poorer districts would not be able to raise revenue comparable to what wealthier districts could generate without imposing "astronomical tax rates."[329] In other words, wealthy districts can easily make up the shortfall between the State's level of funding and educational adequacy, particularly if they have fewer Disadvantaged Students. Poorer districts cannot, particularly if they have more Disadvantaged Students. The report of the Equalization Committee also supports a reasonable inference that although the State purports to use Division III Equalization Funds

---

[328] *Id.* ¶ 48 (citing Del. Equalization Comm., Fiscal Year 2018 Recommendations 6 (Mar. 2017), available at https://www.doe.k12.de.us/site/handlers/filedownload.ashx?moduleinstanceid=9243&dataid=20933&FileName=FY18%20Equalization%20Final%20Report.pdf.

[329] Del. Equalization Comm., *supra*, at 8.

to address the imbalance, the amount is insufficient, is allocated based on outdated criteria, and generates arbitrary results.

The plaintiffs contend that the resulting financing system violates the Education Clause, "because it places an unreasonably heavy burden on taxpayers residing in school districts with low property values to provide sufficient resources to children in those districts."[330] In a constitutional system, the State would provide all school districts with enough resources to provide the constitutionally mandated level of education per pupil, taking into account that Disadvantaged Students need extra resources. At a minimum, the State would provide sufficient resources so that "local school districts have substantially equal access to similar revenues per pupil through a similar tax effort." [331] In such a system, poorer districts would not have to strain make up the difference and potentially fall short of the amount required to achieve the constitutionally mandated minimum.

At the pleading stage, it is reasonably conceivable that the plaintiffs could prove a set of facts at trial that would enable them to prevail on this claim. They have pled disparities in taxable wealth and student spending across districts. They have also pled that the system benefits wealthy districts who need it least and harms poorer districts who need it most. At the pleading stage, the system seems to be generating arbitrary and unfair

---

[330] Compl. ¶ 183.

[331] *Id*. ¶ 182.

117

results. Either way, it is reasonably conceivable that such a system is not "general and efficient."

Count II pleads a violation of the Education Clause. The motion to dismiss Count II on this basis is denied.

## C.    Justiciability

So far, this decision has concluded that the Education Clause has a qualitative dimension and that the complaint's allegations state a claim that Delaware's system of public schools falls short of the constitutional mandate. According to the State, the plaintiffs' claim still should be dismissed because the courts are not competent to apply the Education Clause. The State maintains that whether Delaware's system of public schools satisfies the Education Clause is a non-justiciable political question. This decision reaches a different conclusion.

Delaware's Constitution vests the "judicial power" in the Delaware Supreme Court and Delaware's system of lower courts. Article I, Section 9 states: "All courts shall be open; and every person for an injury done him or her . . . shall have remedy by the due course of law, and justice administered according to the very right of the cause and the law of the land . . . ."[332] Under these provisions, it is "the duty of the courts to protect

---

[332] Del. Const. art. I, § 9.

constitutional guarantees."[333] "[O]nly the Delaware judiciary has the power, 'province and duty . . . to say what the law is' . . . ."[334]

The federal courts have developed the concept of a "political question" to describe a case that a court should abstain from hearing because the issue would intrude on the authority of a coordinate branch of government.[335] The Delaware Supreme Court has discussed the possibility of political-question abstention on four occasions, but has never abstained on that basis.[336] Instead, the Delaware Supreme Court has held that a case which

---

[333] *Rickards v. State*, 77 A.2d 199, 205 (Del. 1950).

[334] *Evans*, 872 A.2d at 549 (quoting *Marbury*, 5 U.S. (1 Cranch) at 178); *accord Troise*, 526 A.2d at 905. *Cf. Super. Ct. v. State Pub. Emp. Relations Bd.*, 988 A.2d 429, 431–33 (Del. 2010) (holding that executive branch tribunal lacked jurisdiction over a union's petition to represent Superior Court bailiffs because "[t]he Delaware Constitution vests in the Chief Justice general and supervisory powers over all courts, which includes court employees").

[335] *See Baker v. Carr*, 369 U.S. 186, 217 (1962) (identifying possibility of abstention in "political question" cases but deciding case on merits).

[336] *See Troise*, 526 A.2d at 904 (discussing considerations but resolving case involving status of Governor's appointees); *Mayor and Council of Dover v. Kelley*, 327 A.2d 748, 754 (Del. 1974) (noting that the extension of the boundaries of a city is generally a political matter, but finding case justiciable and invalidating an annexation vote, after because "once the state has established an electoral procedure to decide such an issue, the constitutional principles relevant to elections apply"); *State ex rel. Wahl v. Richards*, 64 A.2d 400, 402 (Del. 1949) (holding that constitutional provision making the House the sole "judge of the elections, returns and qualifications of its members" did not prevent court from hearing petition for writ of mandamus to Board of Canvass for recount (internal quotation marks omitted)); *Op. of Justices*, 413 A.2d 1245, 1250 (Del. 1980) (declining to issue an advisory opinion on effect of legislative action on a federal constitutional amendment because "whether an issue of Delaware ratification of the ERA Amendment be regarded as justiciable or political, the result is the same: the issue is exclusively Federal").

"turns on the meaning of a constitutional provision . . . presents a justiciable issue."[337]

When plaintiffs have brought challenges in other jurisdictions involving an education clause, the defendants have regularly argued that the claim represented a non-justiciable political question.[338] In the jurisdictions with Category II clauses like Delaware's, the highest courts in ten states have rejected political-question arguments explicitly and held that comparable challenges under their states' education clauses were justiciable.[339] In three other states with Category II clauses, the states' highest courts held

---

[337] *Troise*, 526 A.2d at 905; *see also O'Neill v. Town of Middletown*, 2006 WL 205071, at *13–14 (Del. Ch. Jan. 18, 2006) (observing that although an overly expansive review of administrative land use decisions would "tread dangerously into the realm of political questions," a right to judicial review must "be recognized for claims of violations of certain of plaintiffs' constitutional rights").

[338] *See* Meira Schulman Ferziger, *Procedural Issues Concerning Public School Funding Cases*, 115 A.L.R. 5th 563 (2004 & Supp. 2018) (collecting cases on justiciability); Julia A. Simon-Kerr & Robynn K. Sturm, *Justiciability and the Role of Courts in Adequacy Litigation: Preserving the Constitutional Right to Education*, 6 Stan. J.C.R. & C.L. 83 (2010) (summarizing decisions addressing justiciability of challenges under state education clauses; arguing that challenges are justiciable); *see also* Will Stancil & Jim Hilbert, *Justiciability of State Law School Segregation Claims*, 44 Mitchell Hamline L. Rev. 399 (2018) (summarizing and critiquing decisions that have dismissed challenges under state education clauses as being non-justiciable; arguing that challenges to *de facto* segregation are justiciable).

[339] The ten states with Category II clauses where the highest state courts have addressed the issue explicitly are Arkansas, Colorado, Idaho, Kentucky, Minnesota, Ohio, Pennsylvania, South Dakota, Texas, and Wyoming. *See Lake View*, 91 S.W.3d at 482–85; *Lobato v. State (Lobato II)*, 218 P.3d 358, 374 (Colo. 2009) (*en banc*); *Idaho Schools I*, 850 P.2d at 734; *Rose*, 790 S.W.2d at 209; *Cruz-Guzman*, 916 N.W.2d at 10; *DeRolph*, 677 N.E.2d at 737; *William Penn*, 170 A.3d at 457; *Olson v. Guindon*, 771 N.W.2d 318, 323 (S.D. 2009); *Campbell*, 907 P.2d at 1258; *Neeley v. W. Orange-Cove Consol. Ind. Sch. Dis.*, 176 S.W.3d 746, 772 (Tex. 2005). In addition to the states with Category II clauses, courts in states with education clauses that fall into other categories have rejected political

implicitly that the comparable challenges were justiciable by addressing the claims on the merits.[340] Illinois is the only state with what is arguably a Category II clause that has held that a comparable claim was non-justiciable.[341]

Based on extant Delaware precedent, this case does not present a political question. It turns on the meaning of the Education Clause, which requires that the General Assembly "establish and maintain a general and efficient system of free public schools." The case thus "turns on the meaning of a constitutional provision" and "presents a justiciable

---

question arguments explicitly. *See, e.g.*, *Conn. Coal.*, 990 A.2d at 217; *McDaniel v. Thomas*, 285 S.E.2d 156, 157 (Ga. 1981); *Columbia Falls*, 109 P.3d at 260; *Davis*, 804 N.W.2d at 641 n.34; *Abbeville*, 767 S.E.2d at 163; *Brigham*, 889 A.2d at 719; *Seattle*, 585 P.2d at 80; *Tenn. Small Sch. Sys.*, 851 S.W.2d at 147.

[340] The two states with Category II clauses where the highest state courts have addressed the issue implicitly are Maryland, New Jersey, and West Virginia. *See Hornbeck*, 458 A.2d at 770–81; *Abbott I*, 575 A.2d at 363–66; *Pauley*, 255 S.E.2d at 877. In addition to the states with Category II clauses, courts in states with education clauses that fall into other categories have implicitly rejected political question arguments by addressing the merits. *See, e.g.*, *Roosevelt Elem.*, 877 P.2d at 812; *Serrano v. Priest*, 557 P.2d 929, 943 (Cal. 1976); *Unified Sch. Dist.*, 885 P.2d at 1173; *McDuffy*, 615 N.E.2d at 523; *McGary v. Barrows*, 163 A.2d 747, 752 (Me. 1960); *Comm. for Educ. Equality v. State*, 294 S.W.3d 477, 488 (Mo. 2009) (*en banc*); *Matthews v. State*, 428 P.2d 371, 372 (Nev. 1967); *Bismarck Pub. Sch. Dist. No. 1 v. State*, 511 N.W.2d 247, 256 (N.D. 1994); *Claremont*, 703 A.2d at 1357; *Campaign for Fiscal Equity*, 801 N.E.2d at 330; *Kukor v. Grover*, 436 N.W.2d 568, 574 (Wis. 1989).

[341] *Edgar*, 672 N.E.2d at 1196. Including states with education clauses that fall into other categories adds only four other state supreme court decisions. *See Ex parte James*, 836 So. 2d 813, 815 (Ala. 2002); *Bonner ex rel. Bonner v. Daniels*, 907 N.E.2d 516, 522 (Ind. 2009); *Okla. Educ. Ass'n v. State ex rel. Okla. Legislature*, 158 P.3d 1058, 1065 (Okla. 2007); *City of Pawtucket v. Sundlun*, 662 A.2d 40, 57 (R.I. 1995). The decisions holding that education clause challenges are non-justiciable remain a distinct minority.

121

issue."[342] Not only that, but the legislative history of the Education Clause shows that the delegates to the Constitutional Convention of 1896–97 understood that the clause was mandatory and could be enforced in court. Martin and Saulsbury, two principal opponents of the clause, sought to reduce or eliminate the adjectives that appeared in Spruance's proposal ("general, suitable and efficient") precisely because Martin anticipated that there could be litigation over the meaning of those provisions.[343] Consistent with their expectations, the Delaware Supreme Court has addressed claims under the Education Clause in *Brennan*[344] and twice issued opinions at the request of the Governor addressing questions involving whether laws relating to Delaware's public schools were constitutional under the clause.[345] No decision has ever called into question the power of the Delaware courts to interpret the Education Clause.[346] In this arena, as in others, "only the Delaware judiciary has the power, 'province and duty . . . to say what the law is' . . . ."[347]

---

[342] *Troise*, 526 A.2d at 905.

[343] *See* 2 DEBATES, *supra*, at 1218–19.

[344] 104 A.2d at 784.

[345] *See Op. of Justices*, 246 A.2d at 228; *School Code*, 108 A. at 41.

[346] *Cf. Cruz-Guzman*, 916 N.W.2d at 8 (Minnesota Supreme Court noting in rejecting non-justiciability argument that "[a]lthough we have not had many occasions to interpret or apply the Education Clause, we have consistently adjudicated claims asserting violations of the Clause").

[347] *Evans*, 872 A.2d at 549 (citation omitted).

A closer examination of the factors considered in political-question analysis confirms this conclusion. When discussing the possibility of political-question abstention, the Delaware Supreme Court has cited the considerations identified by the Supreme Court of the United States in *Baker v. Carr*, a case which challenged a legislative failure to update a voter apportionment statute to reflect changes in population distribution and density.[348] The plaintiffs in that case asserted a violation of the Equal Protection Clause. As part of its analysis, the *Baker* Court discussed when it would be appropriate for a federal court to decline to address an issue:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

> Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence.[349]

The *Baker* Court held that the apportionment challenge was in fact justiciable.[350]

---

[348] *Baker*, 369 U.S. at 192; *see Troise*, 526 A.2d at 904 (discussing *Baker*).

[349] *Baker*, 369 U.S. at 217.

[350] *Id.* at 237.

Under the *Baker* test, the question is not whether a case might implicate one or more of these considerations, but rather whether the role of any factor is so "inextricable from the case" as to prevent judicial resolution. That situation does not exist here.

### 1. A Textually Demonstrable Commitment A Coordinate Branch

The State argues that the Education Clause contains "a textually demonstrable constitutional commitment of the issue to a coordinate political department" by virtue of its statement that "the General Assembly shall provide for the establishment and maintenance of a general and efficient system of free public schools." In reality, the Education Clause imposes a mandate on the General Assembly. It is not a grant of authority, but rather a constitutional command that the General Assembly must carry out.[351] The judiciary can and should determine whether the General Assembly has complied with this constitutional requirement.[352]

---

[351] *See City of Newark v. Weldin*, 1987 WL 7536, at *7 (Del. Ch. Feb. 20, 1987) (Allen, C.) (observing that the Education Clause "impos[es] on the legislature the exclusive obligation to establish the *general* parameters of a school system"). *Cf. Cruz-Guzman*, 916 N.W.2d at 8 (describing Minnesota's comparable provision as a "mandate" and "not a grant of power").

[352] *See William Penn*, 170 A.3d at 457 ("The foundation for the rule of law as we have come to know it is the axiom that, when disagreements raise, the Court has the final word on the Constitution's meaning."); *Edgewood*, 777 S.W.2d at 393 (holding that Texas education clause "imposes on the legislature an affirmative duty" and that "this court must, when called upon to do so, measure the constitutionality of the legislature's actions"). *Cf. Cruz-Guzman*, 916 N.W.2d at 10 ("[T]here is no breach of the separation of powers for the [judiciary] to determine the basic issue of whether the Legislature is meeting the affirmative duty that the [education clause in] the Minnesota Constitution places upon it." (internal quotation marks omitted) (first alteration original)).

In support of its argument for absolute deference to the General Assembly, the State points to cases that have referred to the legislature's "plenary" power over education.[353] The General Assembly does indeed have broad and expansive authority in this area, but the Education Clause does not make that authority non-reviewable. A direction to perform a task does not mean that the party performing it judges its own performance. "The idea that any legislature . . . can conclusively determine for the people and for the courts that what it enacts in the form of law, or what it authorizes its agents to do, is consistent with the fundamental law, is in opposition to the theory of our institutions."[354] "[T]he separation of powers in our tripartite system of government typically depends upon judicial review to check acts or omissions by the other branches in derogation of constitutional requirements."[355]

---

[353] *See, e.g.*, *DuPont*, 196 A. at 172 ("[T]he Legislature, under article 10 of the Constitution, has, subject to certain exceptions, plenary power over free public schools . . . ."); *Joseph v. Bd. of Adjustment of Town of Laurel*, 1988 WL 47098, at *3 n.1 (Del. Super. Apr. 29, 1988) (noting, in the context of a zoning dispute, that "[e]xisting constitutional and statutory authority requires the General Assembly to provide for the establishment and maintenance of a general and efficient system of free public schools. The General Assembly has plenary [power] over the establishment, operation and regulation of public schools within the State of Delaware"); *Corder*, 196 A.2d at 407 (addressing the General Assembly's "plenary power" over education).

[354] *Smyth v. Ames*, 169 U.S. 466, 527 (1898), *overruled on other grounds by Fed. Power Comm'n v. Nat. Gas Pipeline Co. of Am.*, 315 U.S. 575 (1942).

[355] *William Penn*, 170 A.3d at 418; *accord id.* at 435 ("Judicial review stands as a bulwark against unconstitutional or otherwise illegal actions by the two political branches."); *see Edgewood*, 777 S.W.2d at 394 ("If the system is not 'efficient' or not

The Education Clause obligates the General Assembly to create and maintain a system of public schools. It does not say that the General Assembly has the authority to determine for itself whether its actions meet the constitutional requirement. As the Minnesota Supreme Court observed, "[a]lthough specific determinations of educational policy are matter for the Legislature, it does not follow that the judiciary cannot adjudicate whether the Legislature has satisfied its constitutional duty under the Education Clause."[356] The Supreme Court of Pennsylvania likewise distinguished between a provision that assigns responsibility for a task and a provision that divests judicial review:

> It will not suffice to prevent our review to observe that the constitutional provision in question has directed the General Assembly, not the courts, to "provide for a thorough and efficient system of public education." The question is whether our Constitution, explicitly or impliedly, can be read as reflecting the clear intent to entrust the legislature with the sole prerogative to assess the adequacy of its own effort to satisfy that constitutional mandate.[357]

---

'suitable,' then the legislature has not discharged its constitutional duty and it is *our* duty to say so.").

[356] *Cruz-Guzman*, 916 N.W.2d at 9; *accord id.* at 10 ("In other words, although the constitution assigns to the Legislature the duty of establishing 'a general and uniform system of public schools,' the interpretation of the constitution's language 'is a judicial, not a legislative, question.'" (citations omitted)).

[357] *William Penn*, 170 A.3d at 439 (quoting Pennsylvania education clause); *accord id.* at 446 (explaining that "*mere* textual commitment of a given function to a given branch of government does not by itself prelude judicial review").

Like the Pennsylvania education clause, Delaware's Education Clause does not "confer[]" upon the General Assembly the exclusive authority to monitor its own compliance."[358]

The fact that the judiciary retains its power to "say what the law is" for purposes of the Education Clause does not divest the political branches of their authority in this area. It rather ensures that the judiciary plays its proper role within a constitutional framework of checks and balances.[359] As courts and scholars have recognized, for the judiciary to endorse the political question argument would constitute an abdication of the judiciary's responsibility in the area of education.[360]

---

[358] *Id.* at 439; *see id.* at 446 (explaining that for judicial review to be displaced, "there must be some indication that vested within the Education Clause mandate is the obligation and prerogative to 'self-monitor'").

[359] *See DeRolph*, 677 N.E.2d at 737 ("The judiciary was created as part of a system of checks and balances."); *see also Lobato II*, 218 P.3d at 371–72 ("[T]he court has the responsibility to review whether the actions of the legislature are consistent with its obligation to provide a thorough and uniform school system."); *Columbia Falls*, 109 P.3d at 261 ("As the final guardian and protector of the right to education, it is incumbent upon the court to assure that the system enacted by the Legislature enforces, protects and fulfills the right."); *Idaho Schools I*, 850 P.2d at 734 (declining "to accept the respondents' argument that the other branches of government be allowed to interpret the constitution for us").

[360] *See Lake View*, 91 S.W.3d at 484 ("This court's refusal to review school funding under our [education clause] would be a complete abrogation of our judicial responsibility and would work a severe disservice to the people of this state. We refuse to close our eyes or turn a deaf ear to claims of a dereliction of duty in the field of education."); *Rose*, 790 S.W.2d at 208–10 ("To avoid deciding the case because of 'legislative discretion,' 'legislative function,' etc., would be a denigration of our own constitutional duty. To allow the General Assembly (or, in point of fact, the Executive) to decide whether its actions are constitutional is literally unthinkable."); *Cruz-Guzman*, 916 N.W.2d at 9 ("Deciding that appellants' claims are not justiciable would effectively hold that the judiciary cannot rule on the Legislature's noncompliance with a constitutional mandate, which would leave the

Like the vast majority of other courts that have interpreted similar provisions, I do not believe that the Education Clause grants the General Assembly the authority to self-monitor, thus depriving the judiciary of its role in a system of checks and balances. The Education Clause assigns a task to the General Assembly. It does not manifest a textually demonstrable commitment to the notion that the General Assembly should judge for itself whether it carried out that task.

### 2. Judicially Discoverable and Manageable Standards

The State next argues that "a lack of judicially discoverable and manageable standards" makes it impossible for the judiciary to determine whether Delaware's system of public schools complies with the Education Clause. The State equates the qualitative component of the Education Clause with the need to determine and proclaim in the abstract what constitutes a proper education, and the Sate argues that it would be hubristic for this

---

Education Clause claims without a remedy."); *DeRolph*, 677 N.E.2d at 737 ("We will not dodge our responsibility by asserting that this case involves a nonjusticiable political question. To do so is unthinkable. We refuse to undermine our role as judicial arbiters and to pass our responsibilities onto the lap of the General Assembly."); *McDaniel*, 285 S.E.2d at 167 ("[W]e would regard our own refusal to adjudicate plaintiffs' claims of constitutional infringement an abdication of our constitutional duties." (internal quotation marks omitted)); Aaron Y. Tang, *Broken Systems, Broken Duties: A New Theory for School Finance Litigation*, 94 Marq. L. Rev. 1195, 1208 (2011) ("The vast majority of courts have rejected state defendants' non-justiciability arguments, reasoning that to decline to address plaintiffs' challenges would amount to an abdication of the court's essential responsibility to interpret the meaning of the state constitution.").

court to think it could "articulate a standard that has evaded scholars since the time of ancient Greece."[361]

I have already discussed my belief that the court should not determine and proclaim in the abstract what constitutes a proper education. The court instead can and should use in the first instance the standards for school adequacy and grade-level proficiency that the political branches have established.[362] The complaint in this case pleads that the State is failing to provide an adequate education based on these standards.

On a broader level, there is nothing particularly vague or indeterminate about the standard that the Education Clause imposes compared to other legal standards. Judicial decisions interpret and enforce concepts such as "probable cause," "due process," "equal protection," and "cruel and unusual punishment."[363] In corporate law, Delaware courts have developed a meaningful jurisprudence based on fiduciary duties of care and loyalty, and a subsidiary concept of good faith.[364] The Delaware judiciary is equally able to interpret and apply the Education Clause.

---

[361] Dkt. 48 at 8.

[362] *See* William S. Koski, *Educational Opportunity and Accountability in an Era of Standards-Based School Reform*, 12 Stan. L. & Pol'y Rev. 301, 307 (2001) (explaining that when using standards developed by the political branches, "concerns about judicial fact-finding, expertise, and legitimacy are ameliorated").

[363] *William Penn*, 170 A.3d at 455.

[364] *See, e.g.*, *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

The State also fears that this litigation would grow into an unmanageable monster, citing lawsuits in other states have generated "protracted litigation spanning multiple years, even decades."[365] The Delaware courts regularly manage complex litigation. This case is within the competence of the Delaware courts.

### 3. The Need For An Initial Policy Decision

The State next argues that it is impossible for a court to rule on this case without an initial policy determination of a kind clearly not suited for the judiciary. The framers of the Constitution of 1897 made the initial policy decision when they drafted the Education Clause and mandated a "general and efficient system of public schools." The judiciary can interpret and apply that standard. Since then, the General Assembly and the Delaware Department of Education have established detailed standards for grade-level proficiency, including metrics for assessing student achievement. The judiciary can interpret and apply those standards as well.

### 4. Respect For Coordinate Branches Of Government

The State finally argues that by resolving this case, this court would express a lack of respect for coordinate branches of government. But as other courts have observed when rejecting similar arguments, this case is no different from others in which a court must pass on the constitutionality of a statute or action taken by the executive.[366] It does not show a lack of respect to coordinate branches for the courts to fulfill their constitutional role in the

---

[365] DOB at 43 & n.170; *see id.* at 57.

[366] *See William Penn*, 170 A.3d at 454–55.

130

system of checks and balances. One might posit that it shows a lack of respect for the role of the judiciary when the political branches argue that their actions should not be subject to any form of review and that the courts are incompetent to perform their role.

The possibility of interference with a coordinate branch looms largest for the remedial phase. If the plaintiffs succeed in proving a constitutional violation, then there will be questions about whether and to what extent this court can impose a remedy. Courts in other jurisdictions have reached different conclusions about the remedies a court can impose. Some have stopped at issuing a declaration regarding constitutional compliance, leaving the solution to the political branches. Others have given the political branches a first crack at a solution. And others have deployed more substantive remedies.[367]

Whether and what kind of remedy issues should be addressed at a future date. The court will only need to cross this bridge if the plaintiffs prove their claims. Any relief will be tailored to address the claims and remedy the harm. The parties will of course have significant input in the crafting of relief. Depending on what (if anything) the plaintiffs prove, the situation might warrant only declaratory relief. Or, it might warrant equitable relief. It is also possible that the court might need to provide provisional relief pending action by the political branches.[368] The possibility that a remedy might include relief that

---

[367] *See generally* Weishart, *Aligning Education*, *supra*, at 346.

[368] In *Belton*, this court recognized the need for a court of equity to provide provisional relief where the right to an education is concerned. *See* 87 A.2d at 871 ("An injunction will issue preventing the defendants and their agents from refusing these plaintiffs, and those similarly situated, admission to School No. 29 because of their

131

goes beyond a declaratory judgment is not a reason to dismiss the complaint at the pleading stage and deny the plaintiffs an opportunity to prove their case.

## D. The Treasurer's Status As A Defendant

The Treasurer contends that he should not be a defendant because his office has nothing to do with education. In terms of the substance of what Delaware schools teach and how they go about doing it, that is true. In terms of the financing of Delaware's public schools, this assertion misses the mark. The Treasurer is the "Trustee of the School Fund" and "make[s] disbursements authorized by law."[369] The Treasurer also serves as the treasurer of each school district and as the receiver and custodian of all moneys to which school districts are entitled by law.[370]

The plaintiffs contend that the State allocates financial resources among school districts and schools in a manner that violates the Education Clause. The Treasurer oversees

color."). The defendants argued that the court should "do no more than direct [the school board] to equalize facilities and opportunities, and give them time to comply with such an order." *Id.* at 869. The court rejected that argument and granted immediate relief. *Id.* at 869–70. The *Belton* case obviously involved quite different and egregious facts, and the remedy of ordering immediate admission to a different school was available to the court. It is not possible to foresee what facts will be proven at trial in this case, but they will necessarily be quite different from *Belton*. It may nevertheless be the case that if a constitutional violation is shown to exist, then some form of provisional remedy will be warranted to address educational inadequacies until the political branches can develop a more enduring solution. *See, e.g.*, *Neeley*, 176 S.W.3d at 798-99 (affirming trial court's issuance of injunction against state officials preventing them from enforcing tax rate cap that had been held to be unconstitutional).

[369] 29 *Del. C.* §§ 2704, 2705(b).

[370] 14 *Del. C.* § 1047.

that process. He is therefore a proper defendant. A survey of sixty-one similar cases in other jurisdictions found that approximately 20% named the state treasurer and another 10% named the state director of finance.[371] To include the Treasurer is therefore not uncommon.

The additional burden of keeping the Treasurer in the case appears minimal. The plaintiffs have sued all of the defendants in their official capacities; none are being sued personally as individuals. The Treasurer is not facing different claims, nor does he have any unique defenses. Recognizing this fact, the defendants have adopted to date and doubtless will continue to adopt a united front. In substance, it is the State that is the real defendant. The Treasurer's separate motion to dismiss is therefore denied.

### III.    CONCLUSION

The Education Clause mandates that the General Assembly "establish and maintain a general and efficient system of free public schools." Counts I and II assert legally cognizable claims that the State has failed to satisfy its obligation for Disadvantaged Students. These issues are justiciable. The motion to dismiss is denied.

---

[371] *See* Spencer C. Weiler et al., *Examining Adequacy Trends in School Finance Litigation*, 345 Ed. L. Rep. 1, 7 (2017).